The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

ESTATE OF WANGSHENG LENG, by
and through administrator, LIPING YANG,

                                    Plaintiffs,

        v.

THE CITY OF ISSAQUAH, ISSAQUAH
POLICE OFFICER M. LUCHT #1201, and
ISSAQUAH POLICE OFFICER KYLEN
WHITTOM, #1210,

                                    Defendants.

No. 2:19-cv-00490-TSZ

PLAINTIFFS' RESPONSE TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

NOTE ON MOTION CALENDAR:
September 18, 2020

LOEVY & LOEVY
David B. Owens, WSBA #53856
100 S. King St. #100-748
Seattle, WA  98014
david@loevy.com


LAW OFFICE OF HARRY WILLIAMS LLC.
Harry Williams IV, WSBA #41020
harry@harrywilliamslaw.com.
707 East Harrison
Seattle WA 98102
206.451.7195
***Attorneys for Plaintiffs***

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................. i

INTRODUCTION ......................................................................................................... 1

LEGAL STANDARD ..................................................................................................... 1

MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT........................................... 2

I.      Background ..................................................................................................... 2

II.     Police Arrive And Force Their Way Into the Apartment ................................ 3

III.    Defendants Unlawfully Seize and Kill an Innocent, Elderly Man ................. 6

IV.     City Practices Caused Leng's Death and It Ratified Defendants' Conduct................ 11

ARGUMENT ............................................................................................................... 15

I.      Defendants' Entry into The Home Was Unreasonable.................................... 15

        A.      Defendants Admit They Lacked Consent ......................................... 17

        B.      There Was No Exigency that Justified Warrantless Entry into the Home ... 18

II.     The Seizure Of Leng—via Takedown and Handcuffs—Was Unreasonable............. 21

III.    Defendants' Use of Force Killed an Innocent Man and Was Unreasonable ............. 24

        A.      No Force Was Justified Here................................................................. 24

        B.      The Force Was Excessive Under Any Measure ................................. 25

        C.      Disputes of Fact Preclude Summary Judgement ................................. 30

        D.      The Officers are Not Entitled to Qualified Immunity...................... 31

IV.     Issaquah's Policies and Practices Killed an Innocent, Elderly Man............................ 33

        A.      Plaintiff's *Monell* Claims Must Proceed to the Jury ............................ 33

        B.      Plaintiffs' Negligence Claim Against the City Must Proceed to the Jury ....... 36

V.      Plaintiffs' Remaining Claims Are Meritorious........................................................ 38

        A.      Punitive Damages Must Be Submitted to the Jury ............................ 38

B.     No "Good Faith" Immunity Applies Here..........................................................38

C.     Plaintiffs Assault And Battery Claims Must Go to the Jury.............................39

D.     Plaintiffs Have Standing to Assert an Indemnification Claim ........................40

CONCLUSION .........................................................................................................................40

# TABLE OF AUTHORITIES

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) ............................................................. 1

*Anderson v. Creighton*, 483 U.S. 635(1987) ...................................................................... 31

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ....................................................1, 2

*Barlow*, 943 F.2d at 1136 .............................................................................................32, 33

*Beltran-Serrano v. City of Tacoma*, 193 Wn.2d 537 (2019)................................... 36, 37, 38

*Bonivert v. City of Clarkston*, 883 F.3d 865 (9th Cir. 2018) ...................................... passim

*Brigham City v. Stuar*t, 547 U.S. 398 (2006) ...................................................................... 18

*Briscoe* v. *City of Seattle*, 2020 WL 5203588 (W.D. Wash. Sept. 1, 2020)..................2, 36

*Brower v. Ackerley*, 88 Wn. App. 87, P.2d 1141 (1997) ...................................................... 40

*Bryan v. Las Vegas Metro. Police Dep't*, 349 F. App'x 132 (9th Cir. 2009) ...................... 33

*Casey v. Chapman*, 123 Wash. App. 670 (2004) ................................................................. 40

*Christie v. Iopa*, 176 F.3d 1231 (9th Cir. 1999).................................................................. 35

*City of Memphis v. Roberts,* 528 S.W.2d 201 (Tenn. 1975) ................................................ 40

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) .......................................................... 35

*Coghlan v. Am. Seafoods Co. LLC.,* 413 F.3d 1090 (9th Cir. 2005) ..................................... 2

*Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014)..................................2, 19, 26, 32

*Dean v. Cty. of Gage, Neb.*, 807 F.3d 931 (8th Cir. 2015) .................................................. 35

*Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) ...................................................26, 37

*Dixon v. Holden,* 923 S.W.2d 370 (Mo. Ct. App. 1996)...................................................... 40

*Feis v. King Cty. Sheriff's Dep't*, 165 Wn. App. 525 (2011)............................................... 39

*Fontana v. Haskin*, 262 F.3d 871 (9th Cir. 2001)................................................................ 25

*Garratt v. Dailey*, 46 Wn.2d 197 P.2d 1091 (1955)............................................................ 40

*Glenn v. Washington Cty.*, 673 F.3d 864 (9th Cir. 2011) .................................................... 25

*Gonzalez v. City of Anaheim*, 747 F.3d 789 (9th Cir. 2014) ................................................... 2, 26, 32

*Graham v. Connor*, 490 U.S. 386 (1989) ................................................................................ passim

*Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985) ........................................................ 34

*Gravelet-Blondin v. Shelton,* 728 F.3d 1086 (9th Cir. 2013) ...........................................24, 33

*Green v. City & Cty. of San Francisco*, 751 F.3d 1039 (9th Cir. 2014)...................................... 24

*Hansen v. Black*, 885 F.2d 642 (9th Cir. 1989).......................................................................... 29

*Hartrim v. Las Vegas Metro. Police Dep't*, 603 F. App'x 588 (9th Cir. 2015) ...........................23, 24

*Headwaters Forest Defense v. County of Humboldt*, 240 F.3d 1185 (9th Cir.2000) ......................24, 32

*Henry v. Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) ................................................................ 34

*Hope v. Pelzer,* 536 U.S. 730 (2002) ....................................................................................... 31

*Hopkins v. Bonvicino*, 573 F.3d 752 (9th Cir. 2009) ............................................................... 16

*Johnson v. City of Olympia*, 2018 WL 4681554 (W.D. Wash. Sept. 28, 2018).............................. 24

*Johnson v. Hawe*, 388 F.3d 676 (9th Cir. 2004)....................................................................... 36

*Kassim Abdulkhalik v. City of San Diego*, 2009 WL 4282004 (S.D. Cal. Nov. 25, 2009) ............. 25

*Kovacic v. Cty. of Los Angeles*, 2016 WL 1125558 (C.D. Cal. Mar. 21, 2016) ........................22, 23

*Larson v. Napier*, 700 F. App'x 609 (9th Cir. 2017) ................................................................. 36

*Leibel v. City of Buckeye*, 382 F. Supp. 3d 909 (D. Ariz. 2019) ................................................ 25

*Liston v. County of Riverside*, 120 F.3d 965 (9th Cir. 1997) .................................................... 31

*Long v. Cty. of Los Angeles,* 442 F.3d 1178 (9th Cir. 2006) ..................................................... 33

*Macareno v. Thomas*, 378 F. Supp. 3d 933 (W.D. Wash. 2019) ............................................... 38

*Maldonado v. Morales*, 556 F.3d 1037 (9th Cir. 2009)............................................................. 31

*Maric v. Alvarado,* 2020 WL 949938 (E.D. Cal. Feb. 27, 2020) .............................................. 20

*Maric v. Alvarado*, 748 F. App'x 747 (9th Cir. 2018) .............................................................. 16

*Martinez-Rodriguez v. United States*, 2009 WL 10676373 (W.D. Wash. Apr. 21, 2009) ............. 25

*Matter of Spielbauer*, 785 F. App'x 369 (9th Cir. 2019)........................................................... 40

*Mena v. Massie*, 2019 WL 467591 (D. Ariz. Feb. 6, 2019) ............................................................. 25

*Meredith v. Erath*, 342 F.3d 1057 (9th Cir. 2003) ........................................................... 29, 32

*MKB Constructors v. Am. Zurich Ins.*, 49 F.Supp.3d 814 (W.D. Wash. 2014) .............................. 11

*Moore v. Richmond Police Dep't*, 497 Fed. App'x 702 (9th Cir. 2012) ............................................ 25

*Motley v. Parks*, 432 F.3d 1072 (9th Cir. 2005) ............................................................................ 25

*Myers v. Brewer*, 773 F. App'x 1032 (10th Cir. 2019) ................................................................. 25

*Nava v. City of Santa Clara*, 2011 WL 1044389 (N.D. Cal. Mar. 22, 2011) ................................ 24

*Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) ................................................................. 25

*Norwich v. Silverberg*, 200 Conn. 367 (1986) ............................................................................. 40

*Parrott v. City of Bellingham*, 2017 WL 3267696 (W.D. Wash. July 31, 2017) ............................. 39

*P.B. v. Koch*, 96 F.3d 1298 (9th Cir. 1996) ................................................................... 24, 25, 32

*Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986) .................................................................... 33

*Quintero v. City of Escondido* 2017 WL 4005345 (S.D. Cal. Sept. 11, 2017) ..........................20, 21

*Read v. Begbie,* 68 F. App'x 36 (9th Cir. 2003) ........................................................................... 24

*Rutherford v. McKissack*, 2011 WL 3421532 (W.D. Wash. Aug. 4, 2011) .................23, 24, 26, 27

*Santos v. Gates*, 287 F.3d 846 (9th Cir. 2002) ................................................................ 26, 29, 32

*Sayavanh v. City of Tukwila*, 2012 WL 1022912 (W.D. Wash. Mar. 23, 2012) ............................. 25

*S.B. v. Cty. of San Diego*, 864 F.3d 1010 (9th Cir. 2017) ............................................................ 26

*Scheuring v. Traylor Bros., Inc.*, 476 F.3d 781 (9th Cir. 2007) ...................................................... 2

*Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994) ............................................................................... 2

*Sierra Medical Services Alliance v. Kent*, 883 F.3d 1216 (9th Cir. 2018) ......................................... 1

*Sledd v. Lindsay,* 102 F.3d 282 (7th Cir.1996) ........................................................................... 33

*Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) ........................................................... passim

*Smith v. Wade*, 461 U.S. 30 (1983) ........................................................................................... 38

*Solomon v. Sheldon*, 2020 WL 996677 (E.D. Cal. Mar. 2, 2020) ................................................. 25

*Soule v. City of Edmonds*, 2015 WL 5022771 (W.D. Wash. Aug. 24, 2015) ................................... 30

*S.R. Nehad v. Browder*, 929 F.3d 1125 (9th Cir. 2019) ....................................................... 32

*Stauffer v. City of Newberg*, 2020 WL 1861675 (D. Or. Mar. 20, 2020) ........................................ 25

*Tate v. Smith*, 2020 WL 978507 (W.D. Wash. Feb. 28, 2020) .................................................. 36

*Tennessee v. Garner*, 471 U.S. 1 (1985) .................................................................... 21

*Thomas v. County of Riverside*, 763 F.3d 1167 (9th Cir. 2014) ................................................ 33

*Thomas v. Dillard*, 818 F.3d 864 (9th Cir. 2016) ....................................................... passim

*Tolan v. Cotton*, 572 U.S. 650 (2014) ............................................................... 1, 19, 31

*Torres v. Hansen*, 2019 WL 4142158 (N.D. Cal. Aug. 30, 2019) ................................................ 21

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012) .................................................. 33

*United States v. Basher*, 629 F.3d 1161 (9th Cir. 2011) ..................................................... 17

*United States v. Bautista*, 684 F.2d 1286 (9th Cir. 1982) ................................................... 22

*United States v. Black*, 482 F.3d 1035 (9th Cir. 2007) .................................................. 17, 18

*United States v. Brooks*, 367 F.3d 1128 (9th Cir. 2004) ............................................ 16, 18, 21

*United States v. Chan–Jimenez*, 125 F.3d 1324 (9th Cir. 1997) ............................................... 21

*United States v. Del Vizo*, 918 F.2d 821 (9th Cir. 1990) .................................................... 22

*United States v. Garcia*, 749 F. App'x 516 (9th Cir. 2018) .................................................. 21

*United States v. Impink*, 728 F.2d 1228 (9th Cir. 1984) ..................................................... 17

*United States v. McConney*, 728 F.2d 1195 (9th Cir.1984) .................................................... 18

*United States v. McNeil*, 812 F. App'x 515 (9th Cir. 2020) .................................................. 38

*United States v. Stafford*, 416 F.3d 1068 (9th Cir. 2005) ................................................... 18

*United States v. Struckman*, 603 F.3d 731 (9th Cir. 2010) ................................................... 15

*United States v. Washington*, 387 F.3d 1060 (9th Cir. 2004) ................................................. 21

*United States v. Wilder*, 187 F.3d 650, 1999 WL 43957 (9th Cir. 1999) ....................................... 18

*Wallisa v. City of Hesparia*, 369 F. Supp. 3d 990 (C.D. Cal. 2019) .......................................... 38

*Washington v. Lambert*, 98 F.3d 118 (9th Cir. 1996) ................................................................. passim

*Welsh v. Wisconsin*, 466 U.S. 740 (1984)........................................................................................ 18

*Wuerfel v. City of Seattle*, 2006 WL 27207 (W.D. Wash. Jan. 5, 2006) ............................................ 39

*Zeigler v. County of San Luis Obisbo*, 2019 WL 3082728 (C.D. Cal. May 16, 2019) ...................... 17

*Ziglar v. Abbasi,* 137 S. Ct. 1843 (2017)........................................................................................ 31

## STATUTES AND OTHER AUTHORITIES

FED. R. CIV. P. 30(B)(6) ................................................................................................................. 11

FED. R. CIV. P. 56(a) ...................................................................................................................... 1

RCW 4.99.030............................................................................................................................... 19

RCW 10.99.070..........................................................................................................................38, 39

RCW 10.99.020(4).......................................................................................................................... 38

## INTRODUCTION

Acting pursuant to the policies and practices of the City of Issaquah, two Issaquah Police Department officers pushed their way into the home of an elderly couple who had committed no crimes, grabbed an elderly man (Wangsheng Leng), forced him to the ground and then bent his torso over a couch, twisted his arms behind his back while bending his neck and needlessly handcuffed him. There was no reason to seize Leng whatsoever, let alone then take him down and handcuff him as part of that seizure—a blatant, independent Fourth Amendment violation. This unlawful subdual caused a number of injuries to Leng, including scrapes and bruises to the arms and legs and a spinal cord injury that ultimately killed him. In seeking summary judgment, Defendants ignore clearly established law and construe the facts *against* Plaintiffs as they seek to exaggerate, in great measure, the circumstances of the "DV Verbal" call. Being dispatched to a call labeled "domestic" does not give officers carte blache to enter a home, seize people, and manhandle them as part of an "investigative detention." The medical evidence also belies Defendants' contention they were "gentle" with Leng and illustrates their force was excessive. Summary judgment cannot be granted. Nor is the City entitled to judgment—a reasonable jury can easily find its practices caused Leng's death; that the City ratified the officers' conduct; and that it was negligent. A trial is required.

## LEGAL STANDARD

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Sierra Medical Services Alliance v. Kent*, 883 F.3d 1216, 1222 (9th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248). "In making that determination, a court must view the evidence 'in the light most favorable to the opposing party.'" *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "In determining whether summary judgment is appropriate, we view the facts in the light most favorable to the non-moving party and draw

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

reasonable inferences in favor of that party." *Scheuring v. Traylor Bros., Inc.*, 476 F.3d 781, 784 (9th Cir. 2007) (citing *Anderson*, 477 U.S. at 255)). Every reasonable factual inference must be drawn in favor of the party opposing the motion for summary judgment, from both direct and circumstantial evidence. *Coghlan v. Am. Seafoods Co. LLC.,* 413 F.3d 1090, 1095 (9th Cir. 2005)

Because Fourth Amendment questions "nearly always require[] a jury to sift through disputed factual contentions, and to draw inferences therefrom*," Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (*en banc*) (*Hemet*), summary judgment "should be granted sparingly in excessive force cases." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (*en banc*). Particularly where the subject of force has died, courts "cannot 'simply accept what may be a self-serving account by the police officer.'" *Cruz v. City of Anaheim*, 765 F.3d 1076, 1080 (9th Cir. 2014) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)); *see e.g. Briscoe* v. *City of Seattle,* 2020 WL 5203588, at *1 (W.D. Wash. Sept. 1, 2020) (applying *Cruz* and denying summary judgment). Instead, "'[because the person most likely to rebut the officers' version of events—the one killed—can't testify, 'the judge must carefully examine all the evidence in the record to determine whether the officer's story is internally consistent and consistent with other known facts.'" *Id.* (quoting *Scott*, 39 F.3d at 915). "This includes circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Id*

## MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT[1]

### I.  Background

1.      Wangsheng Leng and Liping Yang were married in China in 1978 and remained married for nearly 40 years. Dkt. 101-3 at 8-9. The couple had one child, and moved to the United States in 2010 following family who had moved to the Northwest. *Id.* They were very much in love. Dkt. 71-6 at 2. While Leng suffered from mental-health issues, he was otherwise healthy; he would take daily walks, *id.* at 12-13, sing, *id.* at 14, liked to dance, Dkt. 71-6 at  4,

---

[1] Plaintiffs' Statement of Facts "PSOF" are referred to by paragraph number and record citations are to the docket entry ("Dkt.") with pin cite. Plaintiffs have attempted to reduce clutter by, as much as possible, citing declarations, exhibits, and documents already on the docket, incorporated by reference here, rather than reproducing everything the Court already has with this response.

was kind to his wife, *id.* at 2, Dkt. 101-3 at 62, and socialized with other seniors, Dkt. 71-6 at 3-4. Yang expected Leng would join her on life's journey for years to come. Dkt. 101-3 at 123.

2.     On August 5, 2018, the couple set about their routine, including taking a walk and eating with family. Dkt. 101-3 at 12-13. That afternoon, Leng wanted to go for another walk and began to go outside—an issue complicated by his mental health. *Id.* at 14-16. After Leng made some noises and briefly walked outside, Yang corralled her husband, brought him inside, and he went to the bedroom. *Id.* at 14-17. There was no hitting of the walls, stomping, or banging; just noise from their voices. Dkt. 71-6 at 9-10.  This was all very normal. *Id.* at 8. No crime of any sort had been committed between Yang and Leng, and no one was with them outside the apartment. Dkt. 101-3 at 14-17, 36; Dkt. 90-1 at 146; Dkt. 62-7 at  5.

## II.  Police Arrive And Force Their Way Into the Apartment

3.     Unbeknownst to Yang and Leng, Dkt. 71-6 at 9, the neighbor across the hall called the police, claiming he had heard a loud bang and that he had seen, through his peephole, a large, younger man yelling. Dkt. 101-4 at 4-5, 8-9, 15-17. The caller was concerned for Yang and Leng, as he knew they were elderly. *Id.* It is unknown who the neighbor heard yelling;  who, if anyone, he saw;  and it is unknown if what he described actually happened—no one other than Leng or Yang were in their home that afternoon or outside when Leng wanted to go for another walk. Dkt. 101-3 at 36; 52, PSOF, ¶2.[2]

4.     Two Issaquah Police Department Officers, Lucht and Whittom, proceeded to the apartment complex, having been dispatched to a "DV verbal" by a "Korean family," allegedly yelling and possibly throwing things. Dkt. 101-20 at 25.

5.     A "DV Verbal" is the same thing as a "domestic dispute," which is usually just an argument and does not itself reflect the commission of any crime. Dkt. 90-1 at 173.

---

[2] Defendants claim "When Mr. Leng was stopped from leaving, he became upset, and this is presumably what the 911 caller heard." Dkt. 60 at 6. They have cited nothing in support. *Id.* And, this view is contradicted by the caller's interview—he claims to have seen a younger, larger person yelling and was concerned *for* Leng and Yang. Another possibility is that the caller was completely mistaken about things as he was himself an unreliable reporter. *See* PSOF ¶13 & n.3.

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 3
2:19-cv-00490-TSZ

6.      Reasonable officers understand and are trained that simply because a call is dispatched one way, something else may be happening on the ground and so they must assess the situation when they arrive. Dkt. 71-15 at 73-74; Dkt. 101-6 at 192:7-16, 214:10-16.

7.      There is substantial variation in what Issaquah dispatchers might call "DV" and Lucht and Whittom knew that simply because "DV" had been part of the dispatch that this did not mean an act of domestic violence had actually occurred; they knew "DV Verbal" is often just people yelling or conduct in that vein; and that different dispatchers code some things differently, including that some dispatchers might call a disturbance "domestic violence" when no DV had actually been reported. PSOF ¶¶5-6; Dkt. 90-1 at 129-30; Dkt. 71-10 at 181.

8.      Issaquah police use three types of responses to 911 calls. Code 1 is a "[r]outine response. Life, bodily injury or property is not threatened," no lights or sirens are used, and officers follow traffic rules. Dkt. 104-1 at 1. Code 2 is a "Critical response," where information received appears to show that bodily injury and/or substantial property may be threatened," and officers use an intermittent siren along with emergency lights activated. *Id.* Under Code 2, officers are "stepping it up, but not completely laying all caution to the wind." Dkt. 90-1 at 132. Code 3 is an "emergency response," where information received indicates that life and/or property "is threatened," Dkt. 104-1, and involves things like armed robberies or weapons offenses so officers use full lights and sirens arrive ASAP. *Id.*; Dkt. 90-1 at 132.

9.      The "DV verbal" call here was a Code 1, routine call for service, where the officers did not activate their lights or sirens, and the officers knew "life, bodily injury or property" was not believed to be threatened. Dkt. 90-1, 82, 189; Dkt. 71-10 at 66, 199.

10.     When the officers arrived at the apartment complex and approached the apartment, things were quiet; the officers did not see or hear anything indicative of an argument (*i.e.*, "DV verbal"), physical domestic violence, or any crime. Dkt. 71-6 at 10; Dkt. 90-1 at 83, 155; Dkt, 71-10 at 78, 89.

11.     To the officers, the 911 call came from a completely anonymous source, as they did not interview the neighbor or take any other steps to corroborate the 911 call before

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 4
2:19-cv-00490-TSZ

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

approaching Leng and Yang's home. Dkt. 90-1 at 79; Dkt. 71-10 at 34. The officers did not consider whether the call from dispatch was reliable, if the person had called the department with bad information, or anything about the caller at all. Dkt. 90-1 at 156; Dkt. 71-10 at 34-35.

12.     Acting pursuant to IPD policy and practice, the officers did not take into account, investigate, or concern themselves with any discrepancies between what was going on when they arrived and what had been reported on dispatch. Dkt. 71-10 at 36-37, 41-42, 203-04; Dkt. 90-1 at 205. Instead, acting pursuant to IPD practice, and despite the great variability in dispatch, Lucht treats any dispatch for a "domestic" situation "exactly the same." Dkt. 71-10 at 85; *see id.* at 78, 99. Even if Lucht knew the caller had a mental health issue or was otherwise unreliable he was "going to handle" the call "exactly the same way." Dkt. 71-10 at 183-84.

13.     The officers—per their computer system and own experience—had available to them information about the unreliability of the caller, including his "mental" problems. Dkt. 90-1 at 175-76; Dkt. 71-10 at 34-35; Dkt. 101-20 at 1, 7.[3] In fact, had they checked, the officers would have observed the caller had known reliability issues and Lucht had performed "welfare checks" on the caller. Dkt. 71-10 at 35. This information was disregarded. PSOF, ¶¶11-12.

14.     With Lucht in the lead, the officers proceeded to the Leng-Yang apartment. Dkt. 90-1 at 20; Dkt. 71-10 at 88. Only Yang and Leng were there, and when Yang opened the door she was alone (Leng was still in the bedroom). Dkt. 101-3 at 18, 36, 52. After knocking and before the door opened, Defendants did not hear any yelling or commotion inside indicative of any sort of conflict or argument. Dkt. 71-10 at 90.

15.     It was quickly apparent there was a language barrier between the English-speaking officers and Yang, who speaks Mandarin. *Id.* at 73-74, 101, 201; Dkt. 90-1 at 84; Dkt. 101-3 at 21-22. At some point, Leng appeared near the doorway behind his wife. Dkt. 101-3. at 19-20; Dkt. 71-6 at 10. He made noises the officers did not understand, but did not yell and was using his normal voice. Dkt. 101-3 at 20-21; Dkt. 90-1 at 87, Dkt. 71-10 at 74. Yang and

---

[3] Callers are given particular numbers in dispatch, and Leming is listed as having "mental" problems, noted repeated calls about "suspicious" activity, and a concern for officer safety. Dkt. 101-20.

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

Leng showed no signs of injury, and the officers did not observe property damage or anything indicative of things being thrown or broken. Dkt. 71-10 at 75, 214.

16.     In comparison to Leng—who was 5'3" and around 130-50 pounds, Dkt. 101-3 at 121; Dkt. 62-8 at 2—the officers were "big and giant." Dkt. 101-3 at 19. Lucht, a former football lineman and collegiate wrestler, was approximately 220 pounds and stood 5'10" tall. Dkt. 71-10 at 68, 134-36. There were no concerns for officer safety. *Id.* at 95, 97.

17.     Leng did not touch, grab, hold, restrain, or pull Yang in any way. Dkt.101-3 at 20; Dkt. 71-6 at 12-13 (rejecting the notion, from the officers, that Leng had his hands on the back of her shirt—"he never grabbed me, hit me"). Both when she opened the door and thereafter, Yang's clothing was normal; at <u>no point</u> was her t-shirt pulled up to her chest exposing her stomach, as Lucht contends. Dkt. 71-6 at 12-13; Dkt. 101-1; Dkt. 101-2.

18.     Yang or Leng did not slam or attempt to close the door, and nor did it close or start to close. Dkt. 101-3 at 22.  At that point, all that had happened was Yang opened the door, Leng appeared soon after, the officers and couple could not communicate, and Leng made noises the officers did not understand. Dkt 71-10 at 128, 199.

**III.     Defendants Unlawfully Seize and Kill an Innocent, Elderly Man**

19.     The officers were able to use the Language Line, a translation service, to attempt to speak with the couple, but refused to use it. Dkt. 90-1 at 158; Dkt. 71-10 at 100.

20.     Reflective of a lack of exigency, about 30 seconds had transpired at the doorway. Dkt. 90-1 at 144; Dkt. 67-1 at 7-8. Without seeing any crime occur whatsoever, *see* PSOF ¶¶10, 14, 17-18; Dkt. 71-10 at 78, Officer Lucht decided to force his way into the home after Leng made a noise he did not understand. Dkt. 101-3 at 22. There was no emergency or exigency that had occurred that took place before Lucht decided to force his entry into the home. *Id.* Whittom admits no crime occurred that would have justified entry into the home. Dkt. 90-1 at 94-95. Likewise, Lucht admits he did not believe there was an actual emergency; that he had not seen anyone injured or property damage; that he was not worried about officer

PLAINTIFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 6
2:19-cv-00490-TSZ

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

safety or escape; and was left speculating that an emergency might arise if the door was shut (though the door was not actually shutting, PSOF ¶18). *See* Dkt. 71-10 at 208, 209, 214.[4]

21.     Given the language barrier, the officers never obtained consent to enter the apartment and Lucht believed, under IPD policy and practice, he was entitled to enter the home without consent. Dkt. 71-10 at 80-81, 84; *id.* at 83 (confirming that they could not have gotten consent); Dkt. 90-1 at 93. The officers claim they believed Leng did *not* want them to enter the apartment. Dkt. 90-1 at 91-92, 151; Dkt. 71-10 at 74.

22.     Rather than stopping Lucht from entering, though he would not have entered himself, Whittom went in after Lucht did. Dkt. 90-1 at 94-96, 154. Upon entry, the officers immediately grabbed Leng, and Yang had to yield out of the officers' way to avoid being run over by them.  Dkt. 101-3 at 22-23. There is no dispute what happened next: The officers went "hands on" with Leng by each taking one of his arms. Dkt. 90-1 at 96-97; Dkt. 60 at 4:1-3. Whittom went "hands-on" with Leng because Lucht had done so. Dkt 90-1 at 20. Leng, who had been behind Yang, did not advance upon the officers before they seized him; had he done so Yang would have used her arms to stop him. Dkt. 71-6 at 12; Dkt. 101-3 at 121; Dkt. 71-10 at 239, 244-45. The officers did not make any commands to Leng. Dkt. 71-10 at 117.

23.     There was no reason to believe that Leng had committed any sort of act of "domestic violence" or any other crime; that Leng was any sort of threat to the officers or anyone else; and the officers knew, and any reasonable officer would have known, no crime had been committed. PSOF[2] 5-18; Dkt. 90-1 at 96-97 (admitting that he could not identify any crimes that had been committed at that moment); *id.* at 146 (admitting No DV had been committed). Indeed, Lucht later coded the case as a "500 domestic dispute" when he closed

---

[4] The officers have admitted that no crime occurred; Lucht did so when he cleared the case as being a "500 disturbance," rather than a criminal nature. PSOF ¶23. In addition, Lucht admits that he did not observe anyone strike anyone, and stated "I did not observe domestic violence taking place other than the fact that it appeared the female was being restrained at the front door." Dkt. 71-10 at 78. But, on Plaintiffs' facts, there was absolutely no basis for Lucht to conclude Yang was being restrained—her shirt was not pulled up to her chest and Leng never touched his wife at the door. PSOF ¶17. Either way, there is <u>zero</u> basis for Defendants' tellingly unsupported claim that Leng's "actions might technically constitute a domestic assault" Dkt. 60 at 6:4-5.

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

the call, which means that no crime had been committed (otherwise a different clearance code would have been used). Dkt. 62-7 at 1; Dkt. 90-1 at 174; Dkt. 71-10 at 149 (no evidence that supports Leng committed a crime in any way); Dkt. 101-21 at ¶3-4.

24.     A "takedown" occurs when someone is forced by the police from a standing position on to the ground in some way and is a further, separate use of force than merely going "hands on" and restraining someone who is standing. Dkt.101-6 at 158-59 (defining takedown and admitting "initial contact of just going hand on and grabbing on to Mr. Leng would not be considered a takedown"); *id.* at 167-69 (takedown is an additional use of force).

25.     In escalating things further, the officers initiated a takedown of Leng. Dkt. 90-1 at 100-101. Still one on each arm, they rapidly forced Leng across the room and onto the ground and bent over a couch; Leng's legs violently hit the couch and/or floor as did his arms and elbows. *Id.* (admitting Leng's legs hit the couch); Dkt. 101-3 at 26 (officers were coming toward Leng "in a full force" and that they "took him to the sofa and made him kneel[[ down," because "He himself would not kneel down by himself"); *id.* at 34 (describing the force as "violent"); *id.* at 35 (Leng was "forced down"); Dkt. 71-6 at 21 (officers were "forcing him down"; he would "not voluntarily kneel down like this" or "voluntarily put his head down").

26.     Even this was not enough. Once he had been taken-down, the officers applied pressure to Leng's shoulders, twisted his arms behind his back, put his head down with his face into the couch, and handcuffed Leng. Dkt. 90-1 at 105-07, 111-12; Dkt. 71-10 at 120-21; Dkt. 71-6 at 11, 15-16 (head on sofa), 17-18 (describing pressure to head and shoulders); Dkt. 101-3 at 27 ("He was pushed down with his face on the couch. Nobody could see his face." . . . "I saw [] when the police push his head down on the couch, I saw his head moved on the sofa.").[5]

27.     Leng went limp, Dkt. 62-7 at 3, as the officers' actions in taking him down and handcuffing him suffered a cervical spine injury. Dkt. 67-4 at 3-4; Dkt. 67-5 ("[T]he primary

---

[5] Defendants take issue with Plaintiffs pointing out that Leng was taken to *the ground*, albeit with his torso bent over the front of the couch. Dkt. 83 at 1 & n.1. The complaint is baseless because Plaintiffs description is accurate. *See* Dkt. 94 at 2 (and record support cited therein). It is undisputed Leng was not placed "on" the couch; he was on the ground and bent over the sofa, *see* Dkt. 71-4, 71-10 at 118-20, 71-6 at 18-21, 72-7 at 27, 32-35, as Defendants themselves even point out. *See* Dkt. 60 at 8.

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 8
2:19-cv-00490-TSZ

LOEVY & LOEVY
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

medical issue, for which the evidence is highly compelling, is that during the course of subduing and handcuffing him, the police applied sufficient forces to cause severe injury to [Leng's] spinal cord, which caused his death. Mr. Leng became limp right after he was taken across the room by his arms, forced down to the couch face-down, and had handcuffs put on. Becoming limp was the clinical indication that the spinal cord injury had just occurred.").

28.     The officers' force was so violent and significant it caused scrapes and abrasions to Leng's feet, legs, and both of his arms, and, given his face on the couch, caused Yang to fear her husband was going to be suffocated. Dkt. 101-3 at 25 ("I was worried he's going to be suffocated"); *id.* at 31-32 (discussing a possible kick and discovery of injuries later); *id.* at 41-42 (describing injuries, including that "his arm was bleeding"; there was a bruise on his leg"; and that "one of his feet, one of them was swollen, was swollen on the back of the feet, on the top of the foot was swollen"); *id.* at 42 (describing the discovery of the injuries); *id.* at 43 (bruises on the leg came from the police, and were not there before the police got to the apartment); *id.* at 45-46, 48-49, 53-54; *id.* at 120-21 (describing the pictures); *id.* (Q: Is there any doubt in your injuries depicted in those images came from the police? A: Yes, I'm very certain those injuries are result from the clash between him and the police."); Medical Records, Dkt. 101-25 at 9 ("Superficial abrasions to left elbow, bilateral anterior tib/fib region"); *id.* at 37 ("Abrasions on L elbow, R shin, bruise on L shin"); Dkt. 67-4 at 3-4; Dkt. 67-5 at 2; Dkt. 71-6 at 17-17 (describing the injuries); Dkt. 71-6 at 21-22 (explaining the officers "caused him to have external injury to his elbow," which "was bleeding"); Dkt. 71-4 at 4 (explaining "the medical evidence is consistent with an altercation in which the officers used substantial force against Mr. Leng, causing injuries to his spinal cord as well as the superficial injuries to his extremities"). Yang began to cry because she saw the officers coming towards her husband "in a full force." Dkt. 101-3 at 26; Dkt. 71-6 at 19 (Yang hurried because of "too much force").

29.     The manner in which the officers moved Leng across the room and took him down was not "gentle" or free of "aggressive movements," as the officers contend. Dkt. 71-10 at 119-20; Dkt. 60 at 4:19. Instead, that force—when they force him down onto the sofa and

PLAINTIFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 9
2:19-cv-00490-TSZ

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

handcuffed him, Dkt. 71-6 at 19—was "rough," Dkt. 101-3 at 124, "very fast," and "very

scar[y]," Dkt. 71-6 at 20, as confirmed by the injuries Leng suffered. Dkt. 101-3 at 124; *see also*

Dkt. 67-4 at 3-4. ("The substantial force needed to cause a spinal cord injury, the additional,

unexplained injuries elsewhere on Mr. Leng's body, and the description of sitting him up in a

chair after being injured and limp, are all inconsistent with the accounts of the restraint episode

offered by the officers. . . . His injuries are not consistent with having been treated 'gently' in

this process."); Dkt. 67-5 at 2 ("[G]iven not only the spinal cord injury but also the other

injuries to Mr. Leng shown in the photographs of him at the hospital, it remains my opinion

that the amount of force sufficient to cause his spinal cord injury was substantial, and that the

medical evidence contradicts the account provided by the officers."); PSOF ¶¶25-28.

30.     After being seized, Leng did not resist, try to escape or run or attempt to get

away; he did not drop his body or push the officers; he was controlled by them completely and

without difficulty. Dkt. 101-3 at 28; Dkt. 90-1 at 50, 102, 150; Dkt. 71-10 at 117-18, 238.[6]

31.     Leng was obviously injured—before the officers arrived he was able to walk

but afterward he could not stand or even sit upright, was limp and "collapsed as a piece of

noodle." Dkt. 101-3 at 29-30; Dkt. 67-4 at 3-4; Dkt. 62-7 at 3. Leng was bleeding and Whittom

knew his legs hit the couch. PSOF ¶¶25, 28. The officers knew they had injured Leng, given

they had to move him after he had gone limp, and they had called an ambulance. Dkt. 101-3 at

40; Dkt. 71-10 at 153.[7]  Though he was incapacitated and unresponsive, the officers left Leng

handcuffed for several more minutes, until medics arrived. Dkt. 71-10 at 123, 126, 157.

32.     In their reports, the officers wrote "no injuries" had occurred, which was false.

Compare Dkt. 62-7 *with* PSOF ¶¶25-29. Instead, in addition to the scrapes and bruises, the

spine injury Leng suffered from his treatment by Defendants was so significant that Leng was

never able to stand or walk again. Dkt. 101-3 at 27 ("[a]fter he was forced won he was never

---

[6] The suggestion Leng was "struggling" is a serious exaggeration. The sole claim is that Leng had
muscle "tension" or "rigidity" in his arms, which Lucht concedes was "not really fighting." *Id.*
[7] Defendants pout out they called the EMS just seconds after incapacitating Leng and cuffing him. Dkt.
60 at 5:15-16. This is evidence, despite their claims otherwise, Defendants knew Leng was injured.

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

able to c[o]me back up"); *id.* at 30 ("He couldn't sit up"); *id.* at 104 ("He was never able to stand up ever since that incident with the police. Till he died he would never be able to stand up."); Dkt. 90-1 at 187-88 (when they arrived it Leng was able to stand and walk freely but by the end he was unable to stand and had gone limp); Dkt. 67-4 at 2-4.

33.    Leng's death was a homicide; the result of the blunt force trauma he suffered at the hands of Lucht and Whittom. Dkt. 67-4 at 3; Dkt. 89-4 at 1. In the end, Leng "was in great pain. The way he died, he died in pain." Dkt. 71-6 at 30.

**IV.    City Practices Caused Leng's Death and It Ratified Defendants' Conduct**

34.    Officers Lucht and Whittom's actions were consistent with, and reflective of, the policies and practices of the City of Issaquah. *See* Dkt. 101-23 at 5; Dkt. 101-22 at 5. In fact, the City has repeatedly admitted the officers' actions were consistent with and reflective of IPD policy and the City has ratified the conduct a number of times, including:

1) the Use of Force review, which went up the entire chain of command, and found the actions within policy and appropriate, Dkt. 62-7 at 1, Dkt. 101-6 at 95-98, *see* PSOF ¶¶35-37;

2) the City's discovery responses, Dkt. 101-24, Dkt. 101-24 at 7 ("The City is not aware of any police department member acting in a way that the City would find inconsistent with any of the City or department's policies, practices or customs during the interaction with Mr. Leng. No discipline has been administered regarding the interaction."); *id.* at 10 (the City contends "officers Whittom and Lucht acted reasonably and appropriately briefly physically restraining Mr. Leng based on the facts and circumstances know to them at the time of the interaction.");

3) the deposition of the final policymaker (the Chief of Police), Dkt. 101-19 at 10-11, 132, 143; and

4) the City's own binding 30(b)(6) testimony, Dkt. 101-6 at 76, 83-86 (entry into the home), 115-16 (use of force), 117-18 (same), 169 (handcuffing and restraint).[8]

35.    To start, pursuant to IPD policy, uses of force by patrol officers are reviewed by the on-duty sergeant, then the patrol commander, and ultimately the Chief of Police. Dkt. 101-6 at 93, 95-96; Dkt. 101-19 at 26. The Chief of Police, Scott Behrbaum, is the final

---

[8] The City is bound to its 30(b)(6) testimony here. *See* FED. R. CIV. P. 30(b)(6); *MKB Constructors v. Am. Zurich Ins.*, 49 F.Supp.3d 814, 829 n.11 (W.D. Wash. 2014).

PLAINTIFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 11
2:19-cv-00490-TSZ

**LOEVY & LOEVY**
100 S. KING STREET, STE 1100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

policymaker for the City of Issaquah with respect to policing. Dkt. 101-6 at 61. Here—literally

with the use of a rubber stamp—the actions of Lucht and Whittom were approved up the

chain of command to the Chief, who personally signed-off on the Use of Force report. Dkt.

62-7 at 1; Dkt. 101-5 at 29; Dkt. 101-6 at 97. The City approved the officers' acts (and report)

despite the fact Leng had gone to the hospital and the report incorrectly claimed "no injuries"

had occured. Dkt. 101-6 at 97-98. As a matter of practice, despite later learning new

information—including Leng died—no supplement to this review was completed. Dkt. 101-6

at 99-101. Instead, to this day the City identifies "no injuries" associated with this incident in its

official use-of-force log. Dkt. 101-6 at 103; Dkt. 101-11 at 9.

36.     It was hardly surprising that the use of force would be rubber stamped and

approved—every single use of force by an Issaquah officer in the four years prior was deemed

justified and "within policy" by the City of Issaquah. Dkt. 101-17; Dkt. 101-6 at 178-80.

37.     The City's use of force "review" of this incident is illustrative of the fact that

officers' actions in Issaquah are always deemed justified and are not meaningfully reviewed. To

start, Sgt. Asbell, the immediate supervisor whose duties include the initial investigation, did

not actually investigate. Asbell did not examine or look at Leng's injuries; did not take any

pictures of Leng; did not attempt to interview Yang or Leng; did not go to the hospital, though

nothing prevented Asbell from doing so; and did not speak with the 911 caller or any other

potential witnesses. Dkt 101-5 at 16, 23-24, 32-34, 37, 41. Asbell believes she followed City

practices. *Id.* at 40. After Leng died, Asbell did not further investigate the incident, but was

instructed by the City not to speak about the matter. Dkt. 101-5 at 42, 71-72.[9]

38.     The City has a number of written policies that pertain to force and reviewing

force incidents but, in practice on the ground, these policies either are (1) can be disregarded or

(2) provide no meaningful guidance to officers who, instead, will always be deemed justified in

their conduct. *See* Dkt. 67-2 at 2-3; PSOF, ¶¶36, 39, 41-43. That the City's written policies can

---

[9] Asbell was also supposed to determine, per IPD policy, whether Leng and Yang wanted to pursue
civil litigation but failed to do so. Dkt 101-5; IPD Policy 300.7, Dkt.101-13 at 7.

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

be, and are, disregarded; a departure from established police practices that supports an inference the City is either negligent and indifferent to the consequences of failing to follow policy. Dkt. 67-3 at 2. Allowing written policies to be disregarded at the Chief's discretion undermines accountability and transparency and is contrary to accepted police practice. *Id.* at 3.

39.     Such disregard happened here in myriad ways. For example, policy 302 provides a "Use of Force Review board <u>will</u> be convened when the use of force by a member results in serious injury or death to another" to determining whether such force was justified or consistent with department policy and procedure. Dkt. 101-19 at 159 (emphasis added). The Chief of Police decided to forego the Use of Force Review Board at his sole discretion, despite the mandatory language of the written policy. Dkt. 101-19 at 131, 157-58; Dkt. 101-6 at 222. A separate policy contemplates that use of force involving serious bodily injury or death will fully investigated, including officer interviews that should not be unreasonably delayed. Dkt. 101-6 at 74-75. But, the City has decided to not follow its written policy here, and has not conducted an administrative investigation or any officer interviews even to this day. Dkt. 67-3 at 2-3. The City's refusal to conduct an investigation is a departure from accepted police practices. *Id.*

40.     Instead, the City has taken efforts to prevent scrutiny of this incident through its unwritten practices and despite its written policies. For example, in addition to telling Asbell not to discuss the incident, criminal investigators requested to interview the officers but, the department—without asking the officers themselves about the issue—refused to allow them to be interviewed. Dkt. 101-5 at 41-43; 45-46; Dkt. 62-3 at 13; Dkt. 710-at 51, 53, 58-59; Dkt 90-1 at 15, 27, 138-40. The City has not interviewed the officers, and deemed its initial "rubber stamp" process to be sufficient. Dkt. 101-19 at 59; Dkt. 71-10 at 142; Dkt. 90-1 at 136.

41.     Issaquah's written policy concerning use of force provides absolutely no direction to officers, does not prohibit officers from using force that would plainly be excessive, and reflects a practice where all force incidents will be deemed justified. Specifically, Policy 300 provides that officers may use only the amount of force reasonably necessary and lists factors for evaluating the use of force. Dkt. 101-13. In practice, though, and consistent

PLAINTIFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 13
2:19-cv-00490-TSZ

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

with a practice that justifies all acts of force, the City cannot say whether any sort of force would have exceeded Policy 300 with respect to Leng, including the use of a firearm a carotid chokehold (also deadly force, not to be used against the elderly), TASER, or other uses of significant force. Dkt. 101-6 at 115-20, 135-37, 148-49. Indeed, while the written policy provides that deadly force cannot be used unless it is necessary due to an imminent threat of death or serious bodily harm, *id.* at 122-23, the City "cannot make a judgment" on the use of something as extreme as deadly force being completely inappropriate here when that "did not occur." *Id.* at 126; *see also id.* at 146-50, 152-53 (city is unable to say whether any particular force would have been inconsistent with policy, including baton strikes, OC spray,  Taser, deadly force). The City cannot even say (1) that domestic violence calls do not give officers the right to violate citizens' constitutional rights, Dkt. 101-6 at 198-200; that (2) a DV verbal would not have permitted the officers, on their own, to simply kick down open the door of the Leng apartment instead of knocking; or (3) even that it would be inconsistent with the policies of the department for officers to use deadly force simply because officers were dispatched to a domestic violence verbal call. Dkt. 101-6 at 200-03, 210.[10]

42.     The City's inability and refusal to say that any particular acts of police force are inconsistent or violative of  its policies and practices stands in stark contrast to the way reasonable officers are trained—using hypothetical situations to illustrate proper and improper tactics in given circumstances *Id.* at 154-55; *see also* Dkt. 67-3 at 4.

43.     It is both surprising and concerning that the City cannot address hypothetical situations about its own policies. Dkt. 67-3 at 4. That the City cannot say whether, under its policies and practices, certain force options would not be permitted reflects insufficient practices and a failure to provide adequate guidance to officers; it should be plainly obvious that deadly force, TASERS or other intermediate force options were not appropriate here. *Id.*

---

[10] This is truly shocking testimony, as the answer to all of these questions should have easily been "no." Even Defendants police practices expert—and even while improperly exaggerating the circumstances—concedes it would be have been unreasonable to use deadly force or a TASER against Leng. Dkt.71-15 at 109. But, the City itself, cannot and will not say *any particular* action would have been prohibited in any circumstance unless it is the one actually being reviewed. Dkt. 101-6 at 119-20.

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

at 5. Because deadly force would have been obviously excessive, and the City refuses to admit that it would violate its policies for the officers to have shot Leng, its practices are an "extreme departure from established police practices" and illustrative of fundamental defects in practice and officer training; policies and training are only effective if they provide guidance to officers but the City's, here, provide no guidance at all. *Id.* at 3-4.

44.     Moreover, as another instance where Issaquah practice has departed from its written rules to prevent examination and scrutiny of this incident, the City of Issaquah has a policy—1019—requiring complaints be documented on a log and evaluated. Dkt. 101-8;  Dkt. 101 at 19-21. Here, after her husband died, Yang went to the police station to make a complaint about her husband's treatment and met with an IPD commander and the Chief of Police. Nonetheless, to this day, her complaint is not on the City's complaint logs. Dkt. 101-6 at 20-29, 30-33, 50, 51; Dkt. 67-3 at 2. This policy also requires that department members be interviewed subsequent to the complaint. But, no such interviews have ever been undertaken here. Dkt. 101-6 at 51-52, 53; Dkt. 71-10; Dkt. 90-1. No investigator has been designated as a supervisor to look at the complaint whatsoever. Dkt.101-6 at 54.

45.     A criminal investigation is entirely separate from an administrative investigation and involves different questions and proof, and does not absolve the City of the need to conduct its own investigation. Dkt. 67-3 at 3. Yet, the City has not conducted any follow-up investigation following the completion of the criminal investigation or adopted any remedial measures as a result of this incident. Dkt. 101-6 at 11; Dkt. 101-19 at 45-46, 81.

## ARGUMENT

## I.     Defendants' Entry into The Home Was Unreasonable

The Fourth Amendment prohibits entry into citizen's homes in the absence of a warrant, consent, or exigent circumstances. At "the very core of the amendment is the right of a person to retreat into their own home and there be free from government intrusion." *United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010) (citation omitted). Warrantless home

PLAINTIFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 15
2:19-cv-00490-TSZ

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

intrusions are "presumptively unreasonable" and Defendants bear the burden of overcoming

that presumption. *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009).

Defendants make at least four errors throughout their brief with respect to their hyper-

emphasis on "domestic violence." First, Defendants exaggerate the circumstances of this case,

and construe the facts in their favor, which is impermissible at summary judgment. Here,

Defendants received a dispatch from a 911 caller for a "DV Verbal," a routine, Code 1

response where life, bodily injury or property is not threatened, no lights or sirens are used, and

the call does not even necessarily even mean a crime occurred; and they did not attempt to

corroborate anything about the complainant (who was unreliable). PSOF ¶¶5-9, 11-13. On

arrival, the officers did not observe anything that corroborated the call, but, in fact, the

circumstances conflicted with the call in substantial respects (*e.g.*, things were quiet, no

evidence of anything broken, and there were only 2 people in the home, *id.* ¶¶10, 12, 14-15).

Second, Plaintiffs do not dispute officers should *investigate* calls labeled as "domestic." But, the

existence of that general duty is not what matters here. The relevant question is <u>how</u> such

investigations <u>can</u> be carried out, *i.e.*, whether they are constitutional. Defendants' citations to a

general duty to "investigate," *e.g.*, Dkt. 60 at 26-28, are thus inapposite.

Third, "officers may not rely solely on the domestic violence nature of a call to

establish reasonable suspicion for a frisk." *Thomas v. Dillard*, 818 F.3d 864, 878 (9th Cir. 2016).

Consistent with the fact a "DV verbal" call does not mean a crime (or violence) happened,

"domestic violence encompasses too broad an array of crimes to categorically justify

reasonable suspicion," *id.* at 879. As such, and "[g]iven the breadth of domestic violence, the

specific circumstances of a call must be factored into the reasonable suspicion analysis."

*Thomas*, 818 F.3d at 879; *see also Maric v. Alvarado*, 748 F. App'x 747, 749 (9th Cir. 2018) ("A

possible domestic disturbance does not create a 'per se exigent need for warrantless entry.'")

(quoting *United States v. Brooks*, 367 F.3d 1128, 1136 (9th Cir. 2004)).

Fourth, same rule applies to any type of seizure under the Fourth Amendment. The

Ninth Circuit has been unequivocal: because "domestic violence calls vary widely in the actual

PLAINTIFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 16
2:19-cv-00490-TSZ

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

threats they pose to officers and others," <u>a police "officer therefore must consider the specific</u> <u>factual circumstances of an encounter to justify a particular search or seizure,</u>" as its "jurisprudence in the areas of warrantless entry and excessive force bear out." *Thomas*, 818 F.3d at 881-83 (citing *United States v. Black*, 482 F.3d 1035 (9th Cir. 2007)) (emphasis added). Just before this incident, in *Bonivert v. City of Clarkston*, the Ninth Circuit emphasized, again, that even if a call is about possible domestic violence all of its "decisions involving a police response to reports of domestic violence have required an objectively reasonable basis for believing that an <u>actual</u> or <u>imminent injury</u> was unfolding in the place to be entered." 883 F.3d 865, 877 (9th Cir. 2018). Thus: "Fourth Amendment challenges in the context of domestic violence turn on the specific facts of the case, considered in their totality" and the law does not give officers the latitude to assume that "a suspicion of 'domestic violence' alone provides sufficient justification for a given police intrusion." *Thomas*, 818 F3d. at 882.

### A. Defendants Admit They Lacked Consent

Defendants argue they had consent to enter. Consent must be "unequivocal and specific." *United States v. Basher*, 629 F.3d 1161, 1167-68 (9th Cir. 2011). Defendants' position is contrary to their own testimony. Defendants themselves admit that they did not obtain valid consent to enter the apartment (particularly given the language barrier). PSOF ¶¶15, 20-22. Moreover, the stated justification for entry has always been a purported exigency, *e.g.* Dkt.101-6 at 83, 106-07, 115, and Defendants believed that there was *not* consent, because they perceived Leng did not want them inside. Dkt. 71-10 at 80-84, 216-18; Dkt. 60 at 3. This was not consent. *See United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990) (consent is not to be "lightly inferred" and "that free and voluntary consent cannot be found by a showing of mere acquiescence to a claim of lawful authority")' *United States v. Impink*, 728 F.2d 1228, 1232 (9th Cir. 1984) (a "reasonable officer in the Officers' positions would not have believed that he had consent to enter the premises to conduct a criminal investigation" where consent could only be implied); *Zeigler v. County of San Luis Obisbo*, 2019 WL 3082728, at *9-*10 (C.D. Cal. May 16, 2019) (refusing to find consent and denying qualified immunity on consent issue).

PLAINTIFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 17
2:19-cv-00490-TSZ

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

**B. There Was No Exigency that Justified Warrantless Entry into the Home**

Defendants' next argue there was an emergency basis for entering the apartment. Under the emergency aid exception, law enforcement officers may "enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). The "police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests," *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984), because the exception is "narrow" and its boundaries "rigorously guarded." *Bonivert*, 883 F.3d at 877 (quoting *United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005)). Exigent circumstances include "those circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir.1984) (*en banc*).[11]

On Plaintiffs facts, there was absolutely no exigency or emergency that would have permitted the officers to force their way into the home. PSOF ¶¶5-18, 20. Indeed, Defendants version of events—painting Leng as some sort of aggressor—is entirely speculation and the type of assumptions reason able officers do not make, particularly without taking time to

---

[11] Defendants' citation to cases, block quote after block quote, is mostly a distraction. Dkt. 60 at 13-14, 16-17. These cases are largely inapposite—the circumstances in each one are clearly different, and more egregious, than the not-necessarily-criminal "DV Verbal" call from an anonymous person that was not corroborated whatsoever upon arrival of the officers here. *E.g. Brooks*, 367 F.3d at 1135-36 (police actually spoke to 911 caller about possibility woman was being beaten in her hotel room when they arrived, then corroborated that woman was in hotel room, and that she had been loud, and that hotel room was in disarray); *Black*, 482 F.3d 1035 (victim of abuse called to say she had been beaten by boyfriend who had a gun and wanted to return to the apartment to pick up her clothing, and police went to meet the woman outside to help her recover her things but she was not there when they arrived, making them concerned she was injured in the apartment, justifying entry); *United States v. Wilder*, 187 F.3d 650, 1999 WL 43957 (9th Cir. 1999) (unpublished) (police actually corroborated 911 call of *physical* domestic abuse, where woman was screaming "bloody murder," and officers went to search for victim after speaking with the perpetrator who gave them reason to believe she may be in the home). If anything, these cases confirm that what the officers did here was unreasonable. In the two involving 911 calls by "ear-witnesses," the police actually spoke with and took other steps to corroborate what had been reported over dispatch and the calls were far more serious than the Code 1 call here. *Brooks*, 367 F.3d at 1135-36; *Wilder*, 1999 WL 43957, at *1-*2. The third, *Black*, cited at page 13 and 17, was explicit that officers must evaluate the actual circumstances on the ground, 482 F.3d at 1040, rather than make *per se* assumptions about "domestic" calls like those Defendants made here.

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

corroborate what they have been told. Indeed, while Defendants have focused on demonizing an innocent person they killed, they have ignored, and still refuse to accept, the 911 call was made out of a concern for a vulnerable, elderly couple and not because Leng did anything wrong. *Id.* ¶3. The nature of the call—Code 1, verbal—was not such that life or bodily injury was threatened and they did not observe any such threat upon arrival. *Id.* ¶¶5-14.[12]

Defendants' argument further fails because it is premised upon rejecting Plaintiffs' facts, refusing to make any reasonable inferences in Plaintiffs' favor and, instead, attempting to make inferences *against* Plaintiffs. For example, Defendants contend that that Lucht saw "Ms. Yang's t-shirt [was] hiked up on her stomach," meaning Lucht "thought Mr. Lang might be restraining her from behind," and her statements do not "rule out the possibility Mr. Leng was holding onto her shirt from behind." Dkt. 60 at 18. These contentions are absurd, because Yang was plain: "he never grabbed me." Dkt. 71-6 at 12. To construe Yang's statement and declaration as leaving open the "possibility" her shirt was up to her chest—which is what Lucht claims—one must make every inference against Plaintiffs, which cannot be done at summary judgment. *Tolan*, 572 U.S. at 651, 657; *Cruz*, 765 F.3d at 1080. Yang has rejected this notion completely and denied her shirt was pulled up, as Lucht claimed. PSOF ¶17.[13]

Defendants also ignore myriad other facts favorable to Plaintiffs'—the door did not begin to close; there was no evidence of injury or conflict; no evidence to believe a crime had been committed; no sounds of an altercation or fight; and the officers did not understand what Leng said. PSOF ¶¶ 10-23. Seeing an elderly couple at the door, who are uninjured and showing no signs of distress, cannot reasonably give rise to a belief that an emergency is afoot

---

[12] Defendants' references to Washington law concerning domestic violence are puzzling. *E.g.* Dkt. 60 at 14, 21. That law requires officers to ensure that they "protect the complaining party." RCW 4.99.030. But, Defendants stand by the fact that they did not contact the complaining party, and they had no information to support their (completely incorrect) assumption that Leng was an aggressor.

[13] Defendants did not ask Yang about the shirt at her deposition. In an initial interview, Yang is told about the belief Leng "might have had his hands on the back of her shirt." Dkt. 71-6 at 12. Yang rejects the notion: "I did not feel – feel I did not have that feeling, no, no. He never grabbed me." *Id. at* 12-13. Leng's first declaration was generated because Plaintiffs grew concerned Defendants had ignored this given their expert disclosures. Dkt. 101 ¶3. Properly construed, the evidence forecloses the argument Defendants now make in their brief. Dkt. 60 at 2 n.1. Yang's second declaration—confirming the shirt was never up, Dkt. 101-2—refutes this new contention as well. Dkt. 101, ¶3.

LOEVY & LOEVY
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

that involves an imminent threat of harm to the occupants of the home. *Bonivert,* 883 F.3d at 877; *Thomas,* 818 F.3d at 878. Defendants' approach is anathema to summary judgment.

In the end, Defendants' argument boils down to a contention that the call was one for "DV Verbal," which permitted them to storm into the home, despite the fact no crime was being or had been committed and there was no consent or specific exigency. Such a rule—which a reasonable jury could find is the practice of the City—is exactly the kind of blanket domestic violence "exception" to the Fourth Amendment the law forbids as unconstitutional. *Bonivert,* 883 F.3d 877 That is particularly true on the circumstances here—where the officers did not respond to this as an emergency and did not observe, themselves, any evidence of imminent injury whatsoever. Entry was unlawful because "there were simply no circumstances pointing to an actual or imminent injury inside the home." *Id.* Put differently, Defendants present an analogous argument to one rejected in *Bonivert:* police may assume every dispatch coded as "domestic violence" (even where that could be just an argument, and without any corroboration of the 911 call) *always* means some imminent threat exists. Courts have "refuse[d] to extend the emergency aid exception to such an inflexible assumption." *Id.* at 878.

Numerous courts have applied this law and rejected arguments like Defendants' here. *See,* e.g.*, Maric v. Alvarado,* 2020 WL 949938, at *4 (E.D. Cal. Feb. 27, 2020) (denying summary judgment because the defendants had "not met their burden to remove any triable issues of fact as to whether "violence was imminent,'" making summary judgment inappropriate, despite raising concerns about domestic violence) (quoting *Bonivert*, 883 F.3d at 878). For example, *Quintero v. City of Escondido* dealt with a situation like this one—a 911 call that was uncorroborated by the officers about an apparent fight at a residence and where the officers tried to use this as a justification for entry, despite seeing no exigency upon arrival. 2017 WL 4005345, at *8 (S.D. Cal. Sept. 11, 2017). Police argued "that the third-party 911 call coupled with Plaintiff's behavior, namely his refusal to step outside, amounted to reasonable grounds to believe that a woman inside could have been injured or that there was an ongoing threat to her safety." *Id.* But, in the "totality of circumstances, "the uncorroborated third-party 911 call alone

PLAINTIFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 20
2:19-cv-00490-TSZ

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

was not enough to support a reasonable belief that there was an emergency at hand," meaning the "officers' entry into Plaintiff's apartment and the detention in connection with the entry and search were therefore unlawful." *Id.* Likewise, *Torres v. Hansen*, 2019 WL 4142158, at \*10 (N.D. Cal. Aug. 30, 2019), denied summary judgment and qualified immunity for officers who justified home entry in case about a fight where "no evidence is presented to show that the 911 caller specified that the fight was something more than an argument; no evidence is presented that the 911 caller's credibility was assessed; no evidence is presented that anyone other than Torres was in the apartment when police arrived; and no evidence is presented that police saw any condition inside of the apartment suggesting that a fight had occurred or someone was in need of assistance."[14] Defendants here had less than in *Thomas, Bonivert, Quintero*, and *Torres* and the result must be the same: the "officers here lacked an objectively reasonable basis to believe that there was someone inside of the residence in need of immediate assistance," and their entry was unconstitutional. *United States v. Garcia*, 749 F. App'x 516, 518 (9th Cir. 2018).

## II.   The Seizure Of Leng—via Takedown and Handcuffs—Was Unreasonable

Summary judgment can be easily denied on this claim. "A seizure occurs when a law enforcement officer, through coercion, 'physical force[,] or a show of authority, in some way restricts the liberty of a person.'" *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (quoting *United States v. Chan–Jimenez*, 125 F.3d 1324, 1325 (9th Cir. 1997)). "[T]he 'reasonableness' of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out." *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985). "In this nation, all people have a right to be free from the terrifying and humiliating experience of being pulled from their cars at gunpoint, handcuffed, or made to lie face down on the pavement when insufficient reason for such intrusive police conduct exists." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996) (*Lambert*). Accordingly, "police may not employ such tactics every time they have an 'articulable

---

[14] As noted, *supra* n.11, the block-quoted cases cited by Defendants are not even closely analogous to the circumstances here. Courts, as in *Torres*, have distinguished the *actual* domestic violence situations in cases like *Brooks* and from more begin circumstances (which were still more serious than this case).

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

basis' for thinking that someone may be a suspect in a crime." *Id.* Where police detain someone "for purposes of investigation, that stop must be both brief and supported by 'reasonable suspicion' that the individual is engaged in criminal activity." *Kovacic v. Cty. of Los Angeles*, 2016 WL 1125558, at *5 (C.D. Cal. Mar. 21, 2016). A "detention" is "converted into an arrest where the detention is effectuated in an unreasonable manner or for an unreasonable length of time." *Id.* (citing *Lambert*, 98 F.3d at 1185). This occurs, for example, when police use handcuffs or force people down, as happened here. *Lambert*, 98 F.3d at 1186 ("We have stated, 'handcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop.'" (quoting *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982)); *id.* at 1189 (emphasizing that putting people on the ground indicates arrest, as "whether the police physically restrict the suspect's liberty is an important factor in analyzing the degree of intrusion effected by the stop" (citing *United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990). To justify an arrest, officers must have probable cause that the person detained has committed a crime, and reasonable suspicion is insufficient. *Id.* There is no bright-line rule to determine when an investigatory stop becomes an arrest and court consider the "totality of the circumstances, including the "intrusiveness of the stop, *i.e.*, the aggressiveness of the police methods and how much the plaintiff's liberty was restricted" as well as the justification for the use of such tactics, *i.e.*, whether the officers had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken. *Lambert*, 98 F.3d at 1185.

Defendants plainly arrested Leng: they forced their way into his home, grabbed his arms, moved him, forced him down, and then handcuffed him. PSOF ¶¶22-31. Defendants needed probable cause that Leng committed a crime but plainly did not have it, *id.* ¶¶5-22, particularly given their admission they saw no crime and were trying to "investigate" *whether* a crime had happened. Dkt. 90-10 at 98-99 (goal was to investigate); *id.* at 88-89 (no crimes); Dkt. 71-10 at 76-78 (goal was to investigate, did not see crimes), *id.* at 150-51 (no evidence of crime). Indeed, even accepting the notion that Leng waived his arms, said things they did not

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

understand, took a step toward them, and was "angry" the no evidence supports a contention he committed a crime. Dkt. 90-1 at 88-89.

Assuming for the sake of argument only "reasonable suspicion" was needed, the officers lacked any reasonable suspicion that Leng committed any *criminal activity*. The dispatch code, and their response to it, did not imply a crime or life-threatening situation was involved; they did not know whether Leng was a potential victim himself (having ignored the complainant); they had had not observed or heard anything resembling a crime; and they took Leng down after entering his house, without his consent or a warrant, ostensibly to protect Leng and his family. PSOF ¶¶5-31. There was no reason for the takedown or handcuffs, either, as Leng was totally controlled by the two larger officers when they went "hands on." *Id.* ¶¶23-25. Then, Defendants Leng in handcuffs and moved him around cuffed even after he was unresponsive and totally limp, which was outrageous. *Id.* ¶26-31. Defendants' argument is for the jury. *Kovacic*, 2016 WL 1125558, at *5.[15]

Moreover, even making the further assumption that there was some basis to briefly detain Leng (which Plaintiffs dispute), *Lambert* controls here: "when the police have only reasonable suspicion to make an investigatory stop, . . . using handcuffs and other restraints will violate the Fourth Amendment." 98 F.3d at 1187. Plaintiffs, not Defendants could have sought summary judgment on this claim under *Lambert*. Defendants went "hands on" and could have easily stopped there. But, they chose not to. Instead, they then took him down, twisted his arms while he was bent over a couch, and handcuffed despite the fact he was not actively resisting and they took no steps to communicate with him at all. PSOF ¶¶23-27. The

---

[15] Defendants claim it was "necessary to temporarily place him in handcuffs because he was acting in an aggressive, angry and erratic manner toward them and could not follow directions or communicate." Dkt. 60 at 20. This description conflicts with Plaintiffs' facts. And, regardless, none of what Defendants have described indicates Leng committed *any criminal act,* let alone one that would permit their extreme and egregious seizure. *Hartrim*, 603 F. App'x at 589; *Rutherford*, 2011 WL 3421532, at *4. Even assuming for the sake of argument Leng was angry, he had every right to be—the police had just stormed into his home unlawfully and his response cannot justify a seizure. *Thomas*, 818 F.3d at 885 ("A reactive, instinctive movement in response to an officer's own aggressive movement differs significantly from the unprovoked, sudden movements we have held may factor into reasonable suspicion.").

PLAINTIFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 23
2:19-cv-00490-TSZ

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

Fourth Amendment clearly prohibits these aggressive tactics during an "investigative" detention and, regardless of the amount of force used, Defendants had no lawful basis for the takedown and handcuffing that ultimately killed Leng. *Lambert*, 98 F.3d at 1187.

Summary judgment, including on immunity grounds, must be denied. *See, e.g.*, *Green v. City & Cty. of San Francisco*, 751 F.3d 1039, 1052 (9th Cir. 2014) (denying summary judgment and immunity); *Hartrim v. Las Vegas Metro. Police Dep't*, 603 F. App'x 588, 589 (9th Cir. 2015) (denying immunity and applying *Lambert*, including pointing to circumstances where the person seized had "admittedly raised his voice when directing one question to the Officers, was agitated, and may have had his hands clenched at his side," because such "facts are insufficient to justify" a seizure); *Rutherford v. McKissack*, 2011 WL 3421532, at *4 (W.D. Wash. Aug. 4, 2011) (similar); *Johnson v. City of Olympia*, 2018 WL 4681554, at *5 (W.D. Wash. Sept. 28, 2018) (same); *Nava v. City of Santa Clara*, 2011 WL 1044389, at *7 (N.D. Cal. Mar. 22, 2011) (same).

## III.    Defendants' Use of Force Killed an Innocent Man and Was Unreasonable
### A.    No Force Was Justified Here

The foregoing sets forth Defendants' liability under the Fourth Amendment for the seizure, takedown, and handcuffing—all of which violated the constitution under *Lambert*. No such force in the takedown and handcuffing was, therefore, permissible and summary judgment should be denied under clearly established law. Namely, because the *amount* of force must be a balanced against the *need* for force to justify that force, "where there is no need for force, *any* force used is constitutionally unreasonable." *Headwaters Forest Defense v. County of Humboldt*, 240 F.3d 1185, 1201 (9th Cir.2000), vacated on other grounds, 534 U.S. 801, and reaffirmed 276 F.3d 1125, 1130 (9th Cir. 2002); *P.B. v. Koch*, 96 F.3d 1298, 1303 n.4 (9th Cir. 1996) (explaining that "since there was no need for force," the officer's "use of force was objectively unreasonable"); *Read v. Begbie,* 68 F. App'x 36, 37 (9th Cir. 2003) (reversing grant of summary judgment on excessive force claim where, "if a jury were to believe Read's version of the events, the officers had no need to use force"); *Gravelet-Blondin v. Shelton,* 728 F.3d 1086, 1093 (9th Cir. 2013) ("The right to be free from the application of non-trivial force for

engaging in mere passive resistance was clearly established prior to 2008."); *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) (noting cases dating back to 2001 have established that "[a] failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force"); *Myers v. Brewer*, 773 F. App'x 1032, 1038 (10th Cir. 2019) ("[I]t is clearly established that an officer uses excessive force when he executes a forceful takedown of a subject who at most was a misdemeanant, but otherwise posed no threat and did not resist arrest or flee."); *Sayavanh v. City of Tukwila*, 2012 WL 1022912, at *5 (W.D. Wash. Mar. 23, 2012) (explain that where "the circumstances show that there is no need for force, any force used is constitutionally unreasonable" and denying summary judgment and immunity for takedown); *Martinez-Rodriguez v. United States*, 2009 WL 10676373, at *2 (W.D. Wash. Apr. 21, 2009) (same).[16]

## B. The Force Was Excessive Under Any Measure

The Court can also consider the *Graham* factors, and evaluate (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officer or others; and (3) whether the suspect is "actively resisting or attempting to escape." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). This is a totality analysis and other "relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington Cty.*, 673 F.3d 864, 872 (9th

---

[16] *See also Kassim Abdulkhalik v. City of San Diego*, 2009 WL 4282004, at *7 (S.D. Cal. Nov. 25, 2009) ("The law is clear that use of force where no force is necessary amounts to a violation of one's Fourth Amendment right to be free from excessive force. This right is clearly established." (citing *P.B.*, 96 F.3d at 1304; *Leibel v. City of Buckeye*, 382 F. Supp. 3d 909, 915 (D. Ariz. 2019) ("At the time of this incident, which occurred in 2017, the law was well established that '[w]here there is no need for force, any force used is constitutionally unreasonable.'" (quoting *Moore v. Richmond Police Dep't*, 497 Fed. App'x 702, 708 (9th Cir. 2012)); *Stauffer v. City of Newberg*, 2020 WL 1861675, at *10 (D. Or. Mar. 20, 2020) (denying summary judgment and qualified immunity for a takedown); *Solomon v. Sheldon*, 2020 WL 996677, at *9 (E.D. Cal. Mar. 2, 2020), adopted, 2020 WL 1937769 (E.D. Cal. Apr. 22, 2020) (describing the clearly established law that "when no force is necessary, any force—including a push—is unreasonable under the Fourth Amendment" (citing *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001), and *Motley v. Parks*, 432 F.3d 1072, 1089 (9th Cir. 2005)); *Mena v. Massie*, 2019 WL 467591, at *1 (D. Ariz. Feb. 6, 2019) (denying qualified immunity in a case where no force was justified and officers handcuffed woman who had been fighting with her boyfriend before police arrived).

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

Cir. 2011). Indeed, "[e]ven when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1013 n. 3 (9th Cir. 2017) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001)). Considering the *Graham* factors here:

  <u>Quantum of force</u>. Here, the parties vehemently disagree about the amount of force that was used. Plaintiffs contend that the officers were violent, quickly forced Leng to the ground, twisted his harms, and handcuffed him, all of which resulted in scrapes and bruises on his arms and legs and a severe spinal cord injury that ultimately caused his death. PSOF ¶¶22-33. Defendants claim they treated Leng gently, but the medical evidence belies this contention. On Plaintiffs' facts, and regardless, the takedown and handcuffing were additional force that have no justification. These acts were egregious. Moreover, Defendants cannot possibly obtain summary judgment on this issue given the fact their own expert has opined that the amount of force used against Leng *cannot be precisely determined.* Dkt. 73-2 at 10; *Santos v. Gates,* 287 F.3d 846, 855 (9th Cir. 2002) (factual disputes about amount of force preclude summary judgment). This is particularly true because Leng has died. *Gonzalez*, 747 F.3d at 795; *Cruz*, 765 F.3d at 1080.

  <u>Threat of harm to officers or others</u>. On Plaintiffs' facts, the officers had <u>no</u> reason to believe there was any sort of threat to themselves or others. Leng did not threaten them; there was no evidence of injury; Defendants heard not hear any yelling or dispute whatsoever; and did not perceive anything indicative of a threat to anyone. PSOF ¶5-22. As in *Hemet*, which involved physical domestic-violence, the record does not reveal any basis for believing Leng "was armed or that he posed an immediate threat to anyone's safety." *Hemet*, 394 F.3d at 702.

  Defendants claim that "it is undisputed Mr. Leng was erratically moving toward the officers" but that fact is disputed directly. PSOF ¶22. Moreover, merely taking a step toward an officer is not a crime and Defendants have offered no justification for not only going "hands on" but then initiating a takedown and handcuffing even though Leng was under their

PLAINTIFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 26
2:19-cv-00490-TSZ

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

complete control and not actively resisting. PSOF ¶25-30.  Defendants next speculate *with no factual basis whatsoever* that "Leng posed a threat to the potential domestic violence victims inside the house" and was a "potential threat to the officers." Dkt. 60 at 21. This is nonsense. The Defendants themselves had absolutely no reason to believe that this elderly man had committed any sort of crime, and the nature of the situation they responded to—a Code 1— was not a situation where life or bodily injury were threatened. PSOF ¶¶5-23. Moreover, even assuming there had been an actual crime afoot that day, the Defendants offer absolutely no justification or support for the notion that Mr. Leng was a threat to others, as opposed to a victim himself, given they ignored the complainant. *Id.* ¶10-14. As the cases above teach, the police needed a basis for concluding that this person—an elderly man they towered over who could not speak or understand their language—posed an actual or imminent injury to another; they cannot rely upon abstract speculation, which is all they have. *Bonivert*, 883 F.3d at 877.

Defendants' position is contrary to Yang's testimony and even their own, which indicated that there was no concern for officer safety and that they had not observed any violence in their presence. PSOF ¶¶15-18. Nor could they reasonably have perceived threat from Leng, given his small stature and that the officers outnumbered him and were much stronger and larger than him as well. *Id.* ¶15. Indeed, *Hemet*, which Defendants cite, shows their argument is faulty. There, the police had been told by an actual victim that a crime had been committed against her by her husband, but still did not consider the person a threat to the officers during an arrest. 394 F.3d at 702. Leng, an innocent man, was not a threat whatsoever.

Severity of crime. Here *no* crime had been committed and the officers did not have reasonable suspicion, let alone probable cause to believe that one had committed by Leng merely because they received a "DV Verbal" call—which is indicative of an argument and does not indicate a crime has been committed. PSOF ¶5-9. This is *less than a misdemeanor.* They had no reason to know whether Leng was a suspect, victim, bystander, witness or otherwise. Nor did the officers witness Leng commit crime in their presence. They observed a couple, with a language barrier, standing at the door and heard Leng make a noise. *Id.* ¶¶14-18, 20-23.

PLAINTIFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 27
2:19-cv-00490-TSZ

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

Again, as in *Hemet*, summary judgment cannot be granted. There, police responded to a 911 call alleging domestic abuse, and the court noted "the seriousness and reprehensibility of domestic abuse" but concluded that the circumstances of the case—where plaintiff was on the porch alone when police arrived and was not armed—did not "warrant the conclusion that Smith was a particularly dangerous criminal or that his offense was especially egregious." 394 F.3d at 702-03. Under such circumstances, "the nature of the crime at issue provides little, if any, basis for the officers' use of physical force." *Id.* at 703. The same is true here. There was no crime at all. And, there was no threat. The *Graham* factors compel one conclusion: this was a no force situation, and the use of any force was therefore unreasonable.

Resistance or escape. The third *Graham* factor is whether the suspect "actively resisted arrest or attempted to evade arrest by flight." *Hemet*, 394 F.3d at 703. Here, it is undisputed that Leng did not actively resist arrest or attempt any flight. PSOF ¶30. No one contends Leng tried to run away after the officers entered the home. *Id.* The officers had absolutely no trouble seizing Leng, moving him across the room and then forcing him to the ground. Nor did the police ever charge Leng with any crime, including resisting arrest. *Id.* ¶23. Leng was completely controlled and Defendants concede that there was no active resistance. *Id.* ¶30. Flexing one's arms after being grabbed cannot provide a justification for a takedown and handcuffing at all, let alone in a manner that caused scrapes and bruises and seriously injures the cervical spine.

Reasonable alternatives. As the law concerning seizures (e.g. *Lambert*) provides, initiating a takedown and then handcuffing someone constitutes separate, additional force beyond merely going "hands on." The police could have stopped right there. They could have attempted to point Leng to sit down. They could have kept him standing and tried to find out what was going on, even while controlling him as he merely flexed his arms. Dkt. 67-1. But, they did not. Instead, they moved Leng across the room, forced him down, contorted his body, and handcuffed him. The alternative to doing all of that was obvious: not doing it at all.

*     *     *

PLAINTIFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 28
2:19-cv-00490-TSZ

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

There should be no doubt the officers' actions were unconstitutional, given that no force whatsoever was justified and there was no reason to effectuate the seizure with a takedown or handcuffs, as *Lambert* prohibits These circumstances, then, are more egregious than the situation in *Meredith v. Erath*, where the Ninth Circuit reversed the grant of summary judgment and denied immunity, explaining:

> According to Bybee, Erath grabbed her by her arms, forcibly threw her to the ground, and, twisting her arms, handcuffed her. Erath did all of this after Bybee loudly asked several times to see a search warrant. Bybee did not pose a safety risk and made no attempt to leave the Sunset Beach property. Erath was investigating income tax related crimes, which (although felonies) are nonviolent offenses. Bybee objected vociferously to the search and she "passively resisted" the handcuffing, but the need for force, if any, was minimal at best. In these circumstances, it was objectively unreasonable and a violation of the Fourth Amendment for Erath to grab Bybee by the arms, throw her to the ground, and twist her arms while handcuffing her.

*342 F.3d 1057, 1061 (9th Cir. 2003); see also id.* (When these events occurred, July 10, 1998, it was clearly established that the amount of force Bybee says Erath used in handcuffing her was excessive, and a reasonable agent in Erath's position would have known that such conduct violated the Fourth Amendment." (citing *Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989) ("[T]he officers used excess force on Hansen by unreasonably injuring her wrist and arm as they handcuffed her.")).

The Ninth Circuit's decision in *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002), is also controlling. There, officers encountered a mentally ill person who they grabbed to handcuff and who officers claimed to have "guided" to the ground but the plaintiff was unable to describe precisely the mechanism of force. *Id.* at 849. The medical evidence showed a broken back. *Id.* at 850. *Santos* concluded that, "a jury could reasonably conclude that there was little or no need for the application of force against Santos, and that in light of his serious injury, the force used was both substantial and excessive." *Id.* at 853. The Court explained:

> Here, the officers admit to having applied force when restraining Santos. A jury might find believable the officers' contentions that they did so gently, and accordingly might return a verdict in their favor. Alternatively, a jury might find the officers' testimony that they were restrained in their use of force not credible, and draw the inference from the medical and other circumstantial evidence that the plaintiff's injuries were inflicted on him by the officers' use of excessive force. After all, broken backs do not ordinarily result from the type of gentle treatment described by Officer Lee.

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

*Id.* at 852. In the end, on Plaintiff's facts, there was no justification for force against Leng whatsoever, and the amount of force here was unjustified. Moreover, even on Defendants' version of events (which Plaintiffs dispute), there was no justification for the level of force that caused not only scrapes and bruises to Leng's extremities but also caused a spinal cord injury and his death. A reasonable jury can easily find Defendants violated the Fourth Amendment.

### C. Disputes of Fact Preclude Summary Judgement

Nearly all of the <u>material</u> facts concerning this case—what happened when the officers were at the door before entering the home, what happened after they entered, and the amount of force they actually used—are in dispute. Summary judgment cannot be granted. *See, e.g.*, *id.* (denying summary judgment); *Soule v. City of Edmonds*, 2015 WL 5022771, at *3 (W.D. Wash. Aug. 24, 2015) (denying summary judgment on excessive force, assault, and outrage claims where "the parties disagree about the exact sequence of events, the quantum of force that was used, and whether plaintiff was resisting arrest or posed a threat to the officers involved").

There are two versions of events about what happened when the officers first arrived. For Plaintiff, Yang was at the door alone and Leng arrived later. PSOF ¶14. When Leng arrived, he did not touch or grab his wife in any way. Nor, at any point was Yang's t-shirt "pulled up to her chest, exposing her stomach." *Id.* ¶17. But, Lucht (and not Whittom) contend that Yang's t-shirt being "pulled up to her chest, exposing her stomach" was the basis for entering the home and seizing Leng. Yang has testified the door did not begin to close, *id.* ¶18, but Defendants contend otherwise. They also claim Leng took an "aggressive" step toward Lucht,  but Yang has testified that the officers grabbed Leng immediately upon entry and Leng he did not advance—otherwise she would have grabbed him. *Id.* ¶22. Moreover, the officers contend they treated Leng "gently" in their interactions. *Id.* ¶29. By contrast, Yang and the medical evidence confirm, Leng was not treated gently. *Id.* ¶¶25-29. He was forced, quickly and violently, across the room onto his knees on the ground by two larger officers, wherein he sustained scrapes and bruises and, moreover, a severe spinal cord injury that caused his death. *Id.* Finally, Defendants contend they did not use much force, and that Leng had underlying

vulnerabilities and was so fragile he could not have withstood force. Yet, their own expert opines that the exact quantum of force used *cannot* be determined in this case, and Plaintiffs' evidence is that the amount of force sufficient to cause these injuries was substantial. *Id.* ¶29. The amount of force used and its reasonableness are jury questions. *Liston v. County of Riverside*, 120 F.3d 965, 976 n. 10 (9th Cir. 1997) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury.").

### D.  The Officers are Not Entitled to Qualified Immunity

Defendants' discussion of qualified immunity is so cursory that it should not be sufficient to have adequately raised this defense. *Maldonado v. Morales*, 556 F.3d 1037, 1048 n.4 (9th Cir. 2009) ("Arguments made in passing and inadequately briefed are waived."). Assuming they have adequately asserted immunity, this Court asks whether the record—properly construed—illustrates (1) a constitutional violation, and (2) that the right in question was "clearly established" at the time of the conduct. *Tolan*, 572 U.S. at 655-56. Regarding whether a right was "clearly established," the core issue is notice; *i.e.,* the "'salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Id.* at 656 (quoting *Hope v. Pelzer,* 536 U.S. 730 (2002)). Determining whether a right was "clearly established" must occur in the context of a particular case, not in the abstract or at too high a level of generality. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). On the flipside, it is not necessary "that the very action in question has previously been held unlawful" and "an officer might lose qualified immunity even if there is no reported case 'directly on point.'" *Ziglar v. Abbasi,* 137 S. Ct. 1843, 1866-67 (2017) (citation omitted). In short, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741.

Here, Plaintiffs' claims involve straightforward application of existing law, discussed above. Defendants had notice of these claims and the law. Nonetheless, they erroneously (and vaguely) claim that there are no cases that would have put them on notice that their actions were unconstitutional. Dkt. 60 at 22-23. But, Defendants do not discuss dispositive cases—all

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

decided before this incident—discussed above. For example, Defendants ignore cases like *Hemet*, 394 F.3d 689, *Gonzalez*, 747 F.3d 789, and *Cruz*, 765 F.3d 1076, illustrating they cannot obtain summary judgment, and *Hemet* specifically rejects the arguments they make here in far more dangerous circumstances (of actual crimes and violence) than the DV Verbal call here. The same is true of Defendants decision to ignore cases like *Bonivert*, 883 F.3d at 877 and *Thomas*, 818 F.3d at 879, which made it clear that officers must have a belief of an actual injury or imminent harm to justify their actions under the Fourth Amendment and reject the practices of the officers here—to treat all "domestic" calls exactly the same, regardless of the circumstances on the ground and without taking any steps to verify what they have been told over dispatch. As to the seizure via takedown and handcuffs, Defendants ignore the rule of *Lambert*, and its application myriad times over the past several decades to provide that the officers here violated the Fourth Amendment by escalating the seizure. As to force, Defendants ignore several lines of cases, and again *Hemet*, which they themselves have cited. Defendants have also ignored the substantial clearly established law (cited above) that provides where there is no justification for force, any force is unreasonable, *e.g.*, *Headwaters Forest Defense*, 240 F.3d at 1201, and *P.B.*, 96 F.3d at 1303 n.4, while passing over cases like *Meredith*, 342 F.3d at 1061, and *Santos*, 287 F.3d at 853, denying qualified immunity and summary judgment as well. This body of law was beyond sufficient to provide notice here.

Defendants cannot obtain qualified immunity for a further reason: they have refused to construe the facts in the light most favorable to Plaintiffs, as they must. Having elected to ignore the record and proceed on the basis of disputed facts, there can be no summary judgment. *See S.R. Nehad v. Browder*, 929 F.3d 1125, 1140 (9th Cir. 2019) (finding "numerous genuine disputes of material fact, which preclude a grant of summary judgment on qualified immunity" and nothing that when disputed issues of fact are necessary to a qualified immunity determination, such factual issues must be resolved by the jury); *Barlow*, 943 F.2d at 1136 ("In the present case, facts necessary to decide the issue of qualified immunity are in dispute. Summary judgment is therefore appropriate only if the officers are entitled to judgment on the

basis of the facts most favorable to Barlow. That is not the case here. Barlow's version of the facts suggest that no reasonable officer could have believed there was probable cause to arrest or that the amount of force used against Barlow was justified. Summary judgment was therefore inappropriate."); *Bryan v. Las Vegas Metro. Police Dep't*, 349 F. App'x 132, 135 (9th Cir. 2009) ("'Given the significance of the disputed issues of fact here, qualified immunity from suit is effectively unavailable . . . .'" (quoting *Sledd v. Lindsay,* 102 F.3d 282, 288 (7th Cir.1996)).

## IV.   Issaquah's Policies and Practices Killed an Innocent, Elderly Man

### A.   Plaintiff's *Monell* Claims Must Proceed to the Jury

Municipalities cannot currently be liable via *respondeat superior* but may be liable where employees are "acting pursuant to an expressly adopted official policy" or a "longstanding practice or custom." *Thomas v. County of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014). A "policy" is "'a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). Policies, practices, and customs can involve affirmative acts or a refusal to act; *i.e.*, inaction. A practice "of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012). A policy of omission can involve failing to adequately train police officers, where the municipality has "disregarded the known or obvious consequence that a particular omission in their training program would cause municipal employees to violate citizens' constitutional rights." *Tsao*, 698 F.3d at 1143. Cities are also liable where they ratify the actions of their employees or where an official policymaker has directed the constitutional violation. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483-84 (1986); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013) (municipality "may be held liable under § 1983 when the individual who committed the constitutional tort was an official with final policy-making authority or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.").

Defendants seem to imply that Plaintiffs must point to other unconstitutional acts to prove this claim (Dkt. 60 at 26). They are mistaken. Instead, the investigation of this incident is

probative evidence of what the practices of the City are. Such "evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry." *Henry v. Shasta*, 132 F.3d 512, 519 (9th Cir. 1997), as amended, 137 F.3d 1372 (9th Cir. 1998). As the Fifth Circuit put it: "If that episode of such dangerous recklessness obtained so little attention and action by the City policymaker, the jury was entitled to conclude that it was accepted as the way things are done and have been done in the City." *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985). The same is true here.

Plaintiffs have adduced a wealth of evidence illustrating that would easily permit a reasonable jury to conclude that the City's policies and practices were at work here, including but not limited to: (1) the City "rubber stamped" and approved this incident; (2) all Defendants admit the officers were acting pursuant to and consistent with municipal policy, including through the City's binding 30(b)(6) testimony and the testimony of the final policymaker (the police chief); (3) for 2014-2018, every single use of force in Issaquah was deemed justified; (4) the City did not adequately investigate this incident, including by failing to conduct interviews or collect evidence; (5) the City, when it found out Leng died, still did not investigate the incident or update its records that falsely state "no injuries" occurred; (6) the City, instead, took efforts to prevent inquiry, including instructing Asbell not to investigate and prohibiting the officers from participating in the criminal investigation; (7) the City has disregarded its own written policies in declining to investigate or review a use of force that killed an innocent civilian; (8) the City's practices in departing from its written policies when it suits the Chief undermine accountability and transparency and are a departure from established practices; (9) the City's written policies provide no guidance to officers about use of force that would be appropriate or inappropriate; (10) the City cannot say whether using deadly force would have been inconsistent with its practices, though such force would have been obviously unlawful, which is reflective of a practice that deems all force justified; (11) the City's refusal to provide clear guidance is an extreme and troubling departure from accepted policing standards; (12) the City has ratified Lucht's view that it was appropriate to enter the home based upon a "domestic" call even if he did not view an exigency, based upon the call alone; (13) the City

PLAINTIFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 34
2:19-cv-00490-TSZ

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

cannot say it would be inconsistent with its practices for officers to kick doors in to make entry into a home based upon a "DV Verbal" dispatch alone; (14) the City permits a practice in "domestic" violence calls whereby it cannot say that officers must not violate the constitutional rights of citizens; (15) the City has trained its officers to disregard information about a complainant or that contradicts dispatch but, instead, to treat all "domestic" calls exactly the same, though such calls vary widely; and (16) the City's continued defense of the officers (and absence of corrective measures) supports an inference the City was both negligent and deliberately indifferent to the violation of citizen's rights, as with Leng. PSOF ¶¶34-44.

All of these things are sufficient to allow a reasonable jury to conclude that IPD has an unwritten practice where its officers' uses of force will be always be deemed justified, including where an "investigative detention" is plainly unwarranted (as was the handcuffing and takedown of Leng under *Lambert*), and even when force is clearly excessive under *Graham*. Indeed, in Issaquah, officers can go "hands on," "takedown," and "handcuff" first and "ask questions later," except that no questions will ever be asked if the actions kill a civilian.[17]  That the Chief has been deeply involved in this entire incident, which he approved, illustrates the City both approves of the Officers actions and has tried to "sweep" this incident under the "rug" by not investigating a citizen death, even after complaints were made an the criminal investigation ended. A reasonable jury can easily conclude that the City is liable. *See, e.g., Dean v. Cty. of Gage, Neb.*, 807 F.3d 931, 943 (8th Cir. 2015) (reversing dismissal of *Monell* claim where plaintiff introduced evidence that the sheriff "made decisions about the investigations in this case" because it was "for the jury to decide if these decisions . . . "constituted Gage County policy that caused the deprivation of rights here").

As it relates to ratification, as the case cited by Defendants points out, "a plaintiff must prove the 'authorized policymakers approve a subordinate's decision and the basis for it." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (quoting *City of St. Louis v. Praprotnik*, 485

---

[17] A reasonable could also conclude the City has an expressly unconstitutional practice of treating all "domestic" calls exactly the same by allowing officers to make unlawful entry into homes and to seize residents without cause, contrary to bedrock Fourth Amendment principles requiring particularized suspicion and established law *E.g., Thomas*, 818 F.3d at 878-89; *Bonivert*, 883 F.3d at 877-78.

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

U.S. 112, 108 (1988)). Here, the City has done this *repeatedly*—(1) in the initial use of force review, (2) its discovery responses, (3) through the testimony of the final policy maker (the Chief), and (4) again through the its own binding 30(b)(6) testimony. PSOF ¶34. The City ratified Defendants' acts *long before* this suit was filed (when the acts were "rubber stamped" up the chain of command) and that ratification has been confirmed throughout this suit. *Id.* Summary judgment is unwarranted. *See Larson v. Napier*, 700 F. App'x 609, 611 (9th Cir. 2017) (affirming judgment against municipality where, among other things, there was "an admission by the Sheriff that the deputies complied with the department's policy;" chief testified that "he would expect deputies to do the same thing;" and the deputies actions were "taught and accepted as the department approach."). Moreover, a reasonable jury would have no trouble finding that the City of Issaquah—as it does in the very summary judgment motion—finds the officers' actions to be part and parcel of its written practices

Finally, on the failure to train theory, there is a clear obvious training lapse here:  Lucht testified repeatedly he believes he is permitted, essentially, to treat every single domestic call the exact same way, despite the clear law providing that officers must consider the facts on the ground. PSOF ¶12. The City's indifference is evident in the fact that it stands behind its training and practices here. Summary judgment is inappropriate. *E.g.*, *Johnson v. Hawe*, 388 F.3d 676, 686 (9th Cir. 2004) (reversing grant of summary judgment on failure to train).

**B.  Plaintiffs' Negligence Claim Against the City Must Proceed to the Jury**

Defendants seem to misunderstand the negligence claim the Washington Supreme Court has recognized under *Beltran-Serrano v. City of Tacoma*, 193 Wn.2d 537 (2019). As this Court just explained, the claim is against the *City* not the officers. *Briscoe*, 2020 WL 5203588, at *6 n.9.[18] Plaintiff alleged that Issaquah was negligent toward Mr. Leng, resulting in his injury. "At common law, every individual owes a duty of reasonable care to refrain from causing foreseeable harm in interactions with others. . . . This duty applies in the context of law enforcement and encompasses the duty to refrain from directly causing harm to another through affirmative acts of misfeasance." *Beltran-Serrano v. City of Tacoma*, 193 Wn.2d 537, 550,

---

[18] This is also why *Tate v. Smith*, 2020 WL 978507, at *4 (W.D. Wash. Feb. 28, 2020), is inapposite.

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 36
2:19-cv-00490-TSZ

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

442 P.3d 608 (2019). Under *Beltran-Serrano*, a plaintiff may sue for "negligent acts leading up to the ultimate use of force." *Id.* at 546. As discussed above, a reasonable jury can easily find that the City was negligent in its handling of the situation, particularly by training officers in a manner that provides no guidance, by departing from written policies to favor practices on the ground and, for example, by instructing officers to treat all calls the same if labeled "domestic" without considering the circumstances on the ground and, for example, requiring officers to bridge language barriers or speak with complainants before assuming that someone is a criminal and seizing them and taking them down.

Indeed, pursuant to Issaquah's official policy and practice, there was duty for officers find a way to communicate with Mrs. Yang or warn Mr. Leng that about their actions before going "hands on" even though they saw no crime being committed, and there was certainly a failure of duty to then train the officers in a manner that allowed a takedown and handcuffing for an "investigative" detention of someone whom the officers could not speak to and was already under their control. *Compare Beltran-Serrano* 193 Wn.2d at 541-42 (finding negligence where officer did not wait for Spanish interpreter); *see also Deorle v. Rutherford*, 272 F.3d 1272, 1283-84 (9th Cir. 2001) (whether the officer gave a warning before using force that could cause serious injury important in balancing the reasonableness of force under the *Graham* factors). The officers had *no* reason to escalate things, even on their facts, after they seized Leng but their hyper-aggressive stance in entering the home continued to the takedown and handcuffing, rather than even, at that point, taking a measure to try to communicate with the couple.

The officers followed Issaquah practice of not using the Language Line, including even after Leng had been seized, so that they could understand what Yang was saying. All parties testify that the language barrier was immediately apparent. PSOF ¶15. But, Lucht confirmed it was standard practice to engage individuals despite plain language barriers, because he tries to respond to every call the exact same way. Dkt. 70-10 at 22, 78, 85, 99.

As in *Beltran-Serrano*, the officers' actions here "improperly, unreasonably, and unnecessarily escalated the situation" because the city "failed to properly train and supervise

PLAINTIFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 37
2:19-cv-00490-TSZ

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

officers to deal with" non-English speakers 193 Wn.2d at 542. Moreover, the City was

negligent in instructing its officers that simply because a call is "domestic" does not give

officers unfettered authority to enter homes or assume that any male they encounter has does

something violent, rather than actually speaking with a 911 caller or complainant. The actions

leading up to the killing of Leng, including a "failure to respond appropriately to signs of

mental illness or impairment, [the officers'] decision to continue to engage [] in English, and

[the officers'] decision to prevent [Leng] from walking away" all present possible instances of

negligence that only the jury can evaluate. 193 Wn.2d at 544. A jury must determine whether

Issaquah in approving and encouraging entering the home with the intent of applying force

without any understanding of the situation was a result of negligent training and practice.

## V.     Plaintiffs' Remaining Claims Are Meritorious

### A.  Punitive Damages Must Be Submitted to the Jury

Defendants argue their actions were not sufficient to sustain an award of punitive

damages; an assessment that turns on their own credibility and intent. On Plaintiffs' facts, a

reasonable jury could easily conclude the officers' actions in taking Leng down and

handcuffing him was a "reckless or callous indifference to the federally protected rights of

others." *Smith v. Wade*, 461 U.S. 30 (1983). In addition, the "question of intent is a factual

determination to be made by the jury." *United States v. McNeil*, 812 F. App'x 515, 516 (9th Cir.

2020). Moreover, given the pervasive factual disputes, summary judgment cannot be entered.

*See, e.g. Wallisa v. City of Hesparia*, 369 F. Supp. 3d 990, 1021 (C.D. Cal. 2019) (denying summary

judgment on punitive damages in Fourth Amendment case due to material disputes of fact);

*Macareno v. Thomas*, 378 F. Supp. 3d 933, 946 (W.D. Wash. 2019) (same).

### B.  No "Good Faith" Immunity Applies Here

Good faith immunity does not shield Lucht and Whittom. Here, the officers were

called on "DV verbal," and did not have reasonable suspicion of domestic violence. They were

not entering the house to stop a crime, and thus RCW 10.99.070 does not apply because this

was not "an alleged incident of domestic violence." *Cf.* RCW 10.99.020(4) (defining "domestic

violence" as a number of crimes, none of which could conceivably apply to the facts as presented by plaintiffs or even defendants, who admit no crime was committed).

Even if RCW 10.99.070 applied, it would not shield the officers because the analysis is the analogous to the federal qualified-immunity analysis. *Parrott v. City of Bellingham*, 2017 WL 3267696 (W.D. Wash. July 31, 2017). Thus, there cannot be good-faith immunity where federal authority would deny qualified immunity. *Id.* Since the officers are not entitled to qualified immunity, as explained above, they are not entitled to good-faith immunity. And "good faith immunity" plainly does not apply to assault and battery or excessive force. *Wuerfel v. City of Seattle*, 2006 WL 27207 (W.D. Wash. Jan. 5, 2006) (denying immunity).

*Feis* is not to the contrary. The *Feis* Court explained, in considering qualified immunity, that "the right at issue here is the right to be free from law enforcement officers entering one's home to seize firearms after a resident of the house has been arrested for a domestic violence assault and the victim, who officers believe also lives in the home, has requested that the officers remove the firearms from the residence and directed the officers to the location of the firearms." *Feis v. King Cty. Sheriff's Dep't*, 165 Wn. App. 525, 542 (2011). The *Feis* Court found immunity for a search of the home because the search for a gun was analogous to entry to "break up a fight." *Id.* 165 Wn. App. at 551. Here, of course, there was no arrest, no guns, no fight, and no consent to enter, and, in contrast to *Feis*, the officers had no concerns about a life-threatening situation. The entry and seizure here were not in response to a domestic violence situation, but in response to a verbal dispute in which no crime was committed. To have good faith immunity, officers must be responding to a domestic violence situation, not simply ignoring the Constitution because there was anonymous tip about neighbors yelling.

### C.  Plaintiffs Assault And Battery Claims Must Go to the Jury

Defendants' only argument on Plaintiffs' state-law assault and battery claims is that their conduct was reasonable under the Constitution. Dkt. 60 at 27. But, as explained above, that view is incorrect and rests upon a misunderstanding of the law and the facts of this case. "An assault is an attempt, with unlawful force, to inflict bodily injuries upon another,

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 39
2:19-cv-00490-TSZ

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

accompanied with the present ability to give effect to the attempt if not prevented." *Brower v. Ackerley*, 88 Wn. App. 87, 92, 943 P.2d 1141 (1997). The act must be done with (1) the intention of bringing about a harmful or offensive contact or the apprehension thereof, (2) the contact must not be consensual, and (3) the conduct must not be otherwise privileged. *Garratt v. Dailey*, 46 Wn.2d 197, 200, 279 P.2d 1091 (1955). Here, there is no dispute that the officers used force intentionally and without consent. A jury must decide if the force that caused Mr. Leng's death was unlawful force; if the jury determines that the force was unlawful, that use of force is not privileged. The assault and battery claim must be tried by a jury.

### D.  Plaintiffs Have Standing to Assert an Indemnification Claim

Defendants are mistaken that Plaintiffs, as a possible judgment creditor, would not have standing to demand that the officers are indemnified by the City of Issaquah. To be sure, everyone seems to agree Issaquah has an obligation to defend its officers, and, in fact, Issaquah Municipal Code §§ 2.70.050 and .060 requires the City to indemnify its employees. As a potential judgment creditor, then, Plaintiffs have standing to enforce this requirement if Issaquah fails to pay the judgment against the officers. *See Matter of Spielbauer*, 785 F. App'x 369, 371-72 (9th Cir. 2019) (discussing standing of judgment creditor); *Casey v. Chapman*, 123 Wash. App. 670, 676 (2004) (finding standing and explaining that "[p]arties whose financial interests are affected by the outcome of a declaratory judgment action have standing" (citations omitted). And, it is well understood that a secondary purpose of indemnification requirements is to ensure relief to the injured plaintiff. *See, e.g.*, *Dixon v. Holden,* 923 S.W.2d 370, 376-78 (Mo. Ct. App. 1996) (collecting cases and recognizing purposes of indemnification both for officers and plaintiffs) *Norwich v. Silverberg*, 200 Conn. 367, 374-75 (1986) (holding that judgment creditor has standing to enforce indemnification statute against municipality); *City of Memphis v. Roberts,* 528 S.W.2d 201, 205-06 (Tenn. 1975) (similar). Summary judgment cannot be entered.

### CONCLUSION

Defendants killed a vulnerable, elderly man who was at home committing no crimes. Their conduct was unconstitutional and unconscionable. Summary judgment must be denied.

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 40
2:19-cv-00490-TSZ

**LOEVY & LOEVY**
100 S. KING STREET, STE 100
SEATTLE, WA 98104
TELEPHONE: (312) 243-5900

Respectfully Submitted,

September 14, 2020     The Estate of Wangsheng Leng and Liping Yang
*Plaintiffs*

**By**: /s/David B. Owens

LOEVY & LOEVY
David B. Owens, WSBA #53856
100 S. King St. #100-748
Seattle, WA  98014
david@loevy.com

LAW OFFICE OF HARRY WILLIAMS LLC.
Harry Williams IV, WSBA #41020
harry@harrywilliamslaw.com.
707 East Harrison
Seattle WA 98102
206.451.7195
***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I, David B. Owens, an attorney, certify that on September 14, 2020, I caused the

foregoing to be filed on the court's electronic docket via ECF and thereby effected service on

all counsel of record.

/s/David B. Owens